[Cite as *State v. Kemp*, 2013-Ohio-167.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97913**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ANTOINE KEMP

DEFENDANT-APPELLANT

**JUDGMENT:**
CONVICTIONS AFFIRMED; SENTENCE VACATED; REMANDED
FOR RESENTENCING

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-545098

**BEFORE:** Rocco, J., S. Gallagher, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** January 24, 2013

**ATTORNEY FOR APPELLANT**

Dale M. Hartman
2195 South Green Road
University Heights, Ohio   44121

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:    Norman Schroth
         Steven E. Gall
Assistant Prosecuting Attorneys
The Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

KENNETH A. ROCCO, J.:

**{¶1}** Defendant-appellant Antoine Kemp appeals his convictions and sentences after a jury found him guilty of murder and tampering with evidence. He presents six assignments of error. He claims that the charges against him should have been dismissed due to the eight-and-a-half year delay between the commission of the offenses for which he was charged and his indictment. He also asserts that the trial court erred in excluding extrinsic evidence of a witness's alleged prior inconsistent statements, that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, that the trial court should have granted a mistrial or dismissed the charges against him due to the state's violation of discovery rules, and that his sentence is contrary to law.

**{¶2}** Having reviewed the record, this court affirms Kemp's convictions but finds that the sentence imposed by the trial court for murder was contrary to law. Accordingly, we vacate Kemp's sentence and remand to the trial court for resentencing.

**{¶3}** Kemp's convictions stem from the death of Sheila Scales. On June 28, 2002, Scales was found dead on her dining room floor, having been stabbed numerous times. The state's witnesses provided the following account of the events leading up to her death.

{¶4} On June 27, 2002, Lorna Bates, a friend of Sheila's, spoke with her on the telephone as Sheila was getting ready to go out for the evening. Bates testified that "[i]t was late" and that the two women began chatting sometime "after 10:00, 9:00, 10:00 o'clock." While the women were talking, the victim "clicked off" to answer another incoming phone call, then returned to her call with Bates. The victim told Bates that "her baby's father" had called, that he was close by, and that he wanted to come over to drop something off for the baby.

{¶5} The two women continued talking until another call "clicked in." The victim answered the call and then once again returned to talking with Bates. She told Bates that the baby's father had called again and was about ten minutes away. The women continued talking as the victim headed out to her porch. The victim told Bates she wanted to meet him at the car because she did not want him to come into the house. A few minutes later, the victim told Bates, "[H]ere comes my ex, or she [sic] referred to him, the asshole, coming down the street in his van now." Bates heard the victim walk down the stairs to meet him, and the women agreed to talk again the next day. Bates never spoke with the victim again.

{¶6} No evidence was admitted at trial regarding who the victim believed "her baby's father" was at the time she died; however, the state stipulated that, based on DNA testing conducted in 2011, Kemp was not the child's biological father.

{¶7} Kemp was one of Sheila's ex-boyfriends. Several of the victim's neighbors testified that they saw Kemp, or a van similar to one he drove, at Sheila's house during

the evening of June 27, 2002, or the early morning hours of June 28, 2002. Neighbor Donald Avery, who knew Kemp, testified that Kemp frequently visited Sheila's house, and that he spoke with Kemp for a few minutes before Kemp went into Sheila's house at around 11:30 p.m. or midnight that evening. His brother, Douglas Avery, also saw Kemp enter Sheila's house. He did not see Kemp leave, but as it was getting late, he saw an African-American male of similar size and build to Kemp run out of Sheila's house without his shirt on. He could not state whether Kemp was the person he saw.

{¶8} On the evening of the murder, Tomiko Grant was sitting outside on Donald Avery's porch. She testified that she saw Sheila talking to an African-American male on her porch at around 10:00 or 11:00 p.m. She could not identify the man, but assumed they "were together" because she had seen the man at the victim's home multiple times, and he was the only male she had ever seen over there. She did not see the man leave, but when she returned from getting food at approximately 1:30 a.m., he was gone.

{¶9} Neighbor Rachelle Pugh testified that at approximately 1:45 a.m., she saw an older model grey or black van on the street in front of the victim's house. She went into her house and a few minutes later she observed the van, driven by an African-American male, make a number of unusual movements. She saw the van back into Sheila's driveway, pause briefly, pull out, pull into another driveway two houses down, back out, pull into Sheila's driveway again, and pull out again.

{¶10} There was no evidence anyone else had entered or left the victim's house that evening or the following morning.

{¶11} On June 28, 2002, Sheila's mother, Vickie Scales, went to her daughter's house to pick up her grandson for a weekend visit. When she arrived, the front door was wide open, the child was crying, and her daughter was dead on the dining room floor. Vickie Scales could not find a phone, so she ran out of the house and asked a neighbor to call 911.

{¶12} A few minutes later, Officer Lee Davis arrived at the scene. He testified that there was no sign of forced entry and that, based on the lack of blood beneath the victim's body on the dining room rug and streaks of blood on the kitchen floor, blood residue in the kitchen sink, and blood that had splattered down into the basement from a vent in the kitchen, the victim's body appeared to have been dragged from the kitchen to the dining room, and someone had attempted to clean up the blood in the kitchen.

{¶13} According to the coroner, Sheila sustained incised wounds to her chin and neck and three deep stab wounds to her right breast. A deep stab wound to her right chest that penetrated her rib, lung, and liver was the cause of death. The coroner could not state with certainty how long Sheila survived after she sustained this fatal injury but testified that, based on the depth of the wound, her lungs filling with blood, and the amount of blood loss, Sheila would have likely died within "a matter of minutes."

{¶14} Based on the fact that there appeared to be no penetration of any major vessel or any injury to her central nervous system, defense expert Dr. Edward Cornett offered a slightly longer time line, opining that Sheila could have lived 20-30 minutes or longer after sustaining the fatal stab wound.

{¶15} At around the same time Sheila's body was found, Kemp and his parents approached a neighbor, Euclid Police Captain Leonard Nosse, indicating that they had something they wanted to tell him. Kemp told Nosse that he had gone over to the victim's house on the evening of June 27, 2002, that he had left for approximately thirty minutes, and that, when he returned, the front door was ajar, and the victim was lying on the floor in a pool of blood. Nosse recommended that Kemp turn himself in, and after confirming that Cleveland police were investigating an incident that matched Kemp's description, made arrangements for Kemp to be transported to the scene. Kemp was transported to the scene and then ultimately to the police station for questioning.

{¶16} Kemp also told his story to Detectives James Baird and Tim Entenok. Based on his statements to the detectives, Kemp claimed to have arrived at the victim's home sometime between 6:00 and 8:00 p.m. on June 27, 2002. He stated that he and the victim had smoked some marijuana and that he left at around 9:30 or 10:00 p.m. to buy more. Kemp claims that when he returned to the house at around 11:00 or 11:30 p.m., the front door was ajar, and he found the victim lying on the dining room floor with her head pointing toward the kitchen, in a pool of blood. According to Kemp, the victim was still alive when he found her. He claims that as he held her, she died in his arms. Kemp did not call EMS or the police. Instead, when he discovered he had the victim's blood on his clothing, he panicked. He waited for thirty minutes, debating about what to do, and ultimately decided to leave. To avoid being "railroaded," Kemp took off his shirt and

wiped off the back door and front and back door knobs. He disposed of his clothing in a dumpster, and then went home to his girlfriend, Leandra Wright.

{¶17} Wright testified that after Kemp came home, he did not act like himself. Unlike other days, when Kemp came home on June 28, 2002, he did not wake Wright to talk about his day. That next morning, he remained in bed until after Wright left, which was unusual, and told Wright to take his van rather than her own vehicle to go over to her sister's house, which was also unusual. Wright testified that the van was "super clean" and smelled like a fragrance.

{¶18} Later that afternoon, Kemp and his friend Lashown Malliener met Wright at her sister's house and told her what had happened. According to Wright, Kemp told her that he had been at an ex-girlfriend's house drinking beer. He left to buy some more beer and when he returned, he found her in a pool of blood. Kemp told Wright that he did not know if she was dead or alive but that he did not call 911; he just left. He told Wright that a friend of the family was a police officer and that he was going to turn himself in because "he didn't do it." Kemp and Malliener took the van and left. Wright never saw the van again.

{¶19} Neither the clothing Kemp claimed to have discarded after he left the victim's home nor the van he drove around the time of the incident was ever recovered by police.

{¶20} In addition to witness testimony, the state presented DNA evidence linking Kemp to the victim. Cleveland homicide detective, Detective Entenok, was the lead

investigator. He testified that by April 2003, all leads on the case had been exhausted and the investigation had run cold. The case remained dormant until 2007, when the Cuyahoga County Prosecutor's Office received a federal grant to establish a Cold Case Unit, and the case was revived. Previously collected samples obtained from underneath the victim's left and right fingernails were then tested for DNA. They were compared with a DNA sample later obtained from Kemp in 2010. The DNA found under the victim's left fingernail was consistent with Kemp's DNA. No other foreign DNA was found.

{¶21} On December 15, 2010, nearly eight-and-a-half years after Sheila Scales's death, Kemp was indicted on one count of aggravated murder in violation of R.C. 2903.01(A) and one count of tampering with evidence in violation of R.C. 2921.12(A)(1). On July 25, 2011, Kemp filed a motion to dismiss the charges against him due to the state's preindictment delay. The trial court denied the motion, and the case proceeded to a jury trial.

{¶22} Following the conclusion of the state's case, Kemp moved for acquittal pursuant to Crim.R. 29. Determining that there was insufficient evidence of prior calculation and design, the trial court granted Kemp's motion and reduced the aggravated murder charge to a charge of murder. After considering all the evidence, the jury found Kemp guilty of murder in violation of R.C. 2903.02(A) and tampering with evidence in violation of R.C. 2921.12(A)(1).

**{¶23}** Kemp was sentenced to life in prison, with eligibility for parole after 15 years, on Count 1, and 36 months on Count 2, to be served concurrently. After the trial court imposed its sentence, Kemp filed his notice of appeal, seeking to have his convictions vacated or reversed.

**{¶24}** He presents six assignments of error for review:

I. The trial court erred by not dismissing the charges against Appellant due to preindictment delay.

II. The trial court erred in violation of the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution which provide rights to Confrontation and Cross-examination, and when it did not permit a witness to testify about prior inconsistent statements.

III. The State failed to present sufficient evidence to sustain a conviction against Appellant.

IV. Appellant's convictions are against the manifest weight of the evidence.

V. Appellant was denied his right to a fair trial when the State of Ohio failed to comply with the discovery rules.

VI. Appellant's sentence is contrary to law.

### Preindictment Delay

**{¶25}** In his first assignment of error, Kemp claims that the trial court erred in refusing to dismiss the charges against him due to the state's preindictment delay. Kemp contends that the eight-and-a-half year delay between the commission of the offenses with which he was charged and his indictment prejudiced his defense and warranted dismissal of the charges against him.

**{¶26}** In reviewing a decision on a motion to dismiss for preindictment delay, we accord deference to the trial court's findings of fact but engage in a de novo review of the trial court's application of those facts to the law. *State v. Wade*, 8th Dist. No. 90029, 2008-Ohio-4574, ¶ 45, citing *State v. Henley*, 8th Dist. No. 86591, 2006-Ohio-2728.

**{¶27}** "An unjustifiable delay between the commission of an offense and a defendant's indictment * * * which results in actual prejudice to the defendant, is a violation of the right to due process of law * * * ." *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984), paragraph two of the syllabus. "To warrant dismissal on the basis of preindictment delay, a defendant must present evidence establishing substantial prejudice." *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 778 N.E.2d 829, ¶ 51, citing *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998). If the defendant establishes prejudice, then the state has the burden of producing evidence of a justifiable reason for the delay. *Id.*

**{¶28}** The determination of whether a defendant has sustained "actual prejudice" as a result of a preindictment delay "involves 'a delicate judgment based on the circumstances of each case.'" *Id.* at ¶ 52, quoting *United States v. Marion*, 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). The court must consider "the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay." *Id.* To establish actual prejudice, the defendant must demonstrate the exculpatory value of the alleged missing evidence. *Wade* at ¶ 45. "In other words, a defendant must show how lost witnesses and physical evidence would have proven the

defendant's asserted defense." *Id.* at ¶ 48, quoting *State v. Robinson*, 6th Dist. No. L-06-1182, 2008-Ohio-3498, ¶ 121. Prejudice is not presumed solely due to a lengthy delay. *State v. Copeland*, 8th Dist. No. 89455, 2008-Ohio-234, ¶ 14 (ten-year delay between crime and indictment did not support dismissal of charges where defendant did not present evidence of substantial prejudice).

{¶29} Kemp argues that if the case had been prosecuted sooner, he "might have been able to find" exculpatory evidence that was no longer available at the time of his indictment. His motion to dismiss below originally focused on the prejudice he claimed to have sustained as a result of his inability to locate witness Lorna Bates. However, Bates was located before the hearing on Kemp's motion, her contact information was provided to the defense, defense counsel had an opportunity to speak with Bates several months before the trial, and she testified at trial. Accordingly, the delay in Kemp's indictment did not result in any actual prejudice to Kemp as it relates to witness Lorna Bates.

{¶30} Kemp also claims that there may have been additional, unidentified witnesses, who no longer live in the neighborhood and who could no longer be located by the time he was indicted, who may have observed two vans at the scene or other evidence possibly implicating someone else as the murderer. He further contends that if he had been indicted sooner, he could have investigated and determined the identity of Sheila's son's biological father and shifted the focus of the police investigation on him.

{¶31} Although some evidence may have been lost over the years, Kemp's vague claims of prejudice relating to unknown potential witnesses and other possible exculpatory evidence that may have existed are speculative at best. Likewise, Kemp's supposition that, if he had been indicted sooner, he could have by some unspecified means determined Sheila's son's biological father and shifted the focus of the investigation on him, does not establish actual prejudice. Because Kemp has not shown "by concrete proof, the exculpatory value of any alleged missing evidence," he has failed to demonstrate actual, substantial prejudice resulting from the state's delay in bringing the charges against him. *Wade,* 2008-Ohio-4574, at ¶ 48, quoting *Robinson*, 2008-Ohio-3498, at ¶ 121. Accordingly, the trial court did not err in denying Kemp's motion to dismiss based on preindictment delay. Kemp's first assignment of error is overruled.

## Prior Inconsistent Statement

{¶32} In his second assignment of error, Kemp contends that trial court abused its discretion and denied him his constitutional rights of confrontation and cross-examination by excluding evidence of prior statements the victim's mother made to Cleveland homicide detective, Tim Entenok, in 2002, regarding paternity testing that had been performed on the victim's son. Kemp argues that because the victim's mother testified at trial that she did not know the identity of Sheila's son's father, extrinsic evidence of her prior statements to police regarding his paternity should have been admitted under Evid.R. 613(B) to impeach her testimony. This court disagrees.

**{¶33}** The decision whether to admit or exclude evidence at trial falls within the sound discretion of the trial court. *State v. Robb*, 88 Ohio St.3d 59, 69, 723 N.E.2d 1019 (2000). The record must reflect an abuse of discretion, i.e., that the trial court acted in an unreasonable, arbitrary, or unconscionable manner, in order for an appellate court to disturb a ruling of the trial court as to the admissibility of evidence. *State v. Pruitt*, 8th Dist. No. 98080, 2012-Ohio-5418, ¶ 10, citing *State v. Hamilton*, 8th Dist. No. 86520, 2006-Ohio-1949, ¶ 19.

**{¶34}** Evid.R. 613(B) governs the admissibility of extrinsic evidence of a prior inconsistent statement. It states, in relevant part:

> Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:
>
> (1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;
>
> (2) The subject matter of the statement is one of the following:
>
> (a) A fact that is of consequence to the determination of the action other than the credibility of a witness * * *.

**{¶35}** Extrinsic evidence is not admissible under Evid.R. 613(B) unless a proper foundation is laid for its admission. A foundation must be established through direct or cross-examination in which: (1) the witness is presented with the former statement; (2) the witness is asked whether he or she made the statement; (3) the witness is given an opportunity to admit, deny, or explain the statement; and (4) the opposing party is given an opportunity to interrogate the witness regarding the inconsistent statement. *State v.*

*Morgan*, 8th Dist. No. 97934, 2012-Ohio-4937, ¶ 14-15, citing *State v. Theuring*, 46 Ohio App.3d 152, 155, 546 N.E.2d 436 (1st Dist.1988).

**{¶36}** If a witness denies making the statement, extrinsic evidence of the statement is generally admissible; provided, the evidence does not relate to a collateral matter. *State v. Soke*, 105 Ohio App.3d 226, 239, 663 N.E.2d 986 (8th Dist.1995), citing *State v. Riggins*, 35 Ohio App.3d 1, 3, 519 N.E.2d 397 (8th Dist.1986). If, however, the witness admits making the prior statement, the trial court does not abuse its discretion by thereafter refusing to admit extrinsic evidence of that statement. *State v. Eason*, 8th Dist. No. 66060, 1994 Ohio App. LEXIS 4636, *13 (Oct. 13, 1994), citing *State v. Johnson*, 10 Ohio App.3d 14, 460 N.E.2d 625 (10th Dist.1983); *Theuring*, 46 Ohio App.3d at 155, 546 N.E.2d 436; *see also State v. Pierce*, 2d Dist. No. 24323, 2011-Ohio-4873, ¶ 82 ("'[I]f the witness admits making the conflicting statement, then there is no need for extrinsic evidence.'"), quoting *State v. Harris,* 2d Dist. No. 14343, 1994 Ohio App. LEXIS 5763, *22 (Dec. 21, 1994).

**{¶37}** If an inconsistency "relates to a matter only collateral to the issue of [the] defendant's guilt," extrinsic evidence of a prior inconsistent statement may be properly excluded. *Eason* at *13-14. The decision whether to admit evidence of a prior inconsistent statement that is collateral to the issues being tried is a matter within the trial court's discretion. *Riggins*, 35 Ohio App.3d at 3, 519 N.E.2d 397.

**{¶38}** During her cross-examination by defense counsel, Vickie Scales was asked whether paternity tests had been conducted to determine the identity of Sheila's son's

father.  She testified that several tests had been performed but that his father had never been determined.  She further testified that she was questioned by police regarding paternity testing in 2002 and that she had told police, at that time, that Bobby Hall was Sheila's son's father, but that he had been later "ruled out" as the father.

> Q.     [Y]ou talked to the police about who the father was back in 2002 though, correct?
>
> A.     Yes.   They approached me.   Yes.
>
> Q.     And at that time, you had indicated to the police that she was tested for paternity, correct?
>
> A.     Uh-huh.
>
> Q.     And you indicated that Bobby Hall was the father, had you not?
>
> A.     Right.   And he was ruled out.

{¶39} Later on in his cross-examination, defense counsel asked the witness whether she "remember[ed] saying [to police in 2002] that DNA testing were [sic] performed and results showed that Hall was the father."  She testified that she did not remember that and that she was "not sure what [she] told them."   Defense counsel did not conduct any further questioning of Vickie Scales regarding this issue.

{¶40} Kemp asserts that Detective Entenok would have testified that he had a conversation with the victim's mother in 2002 in which she told him that the victim had had a paternity test performed that showed that Bobby Hall was her son's father. Because Vickie Scales admitted, during defense counsel's cross-examination, to making the very statement defense counsel sought to introduce through Detective Entenok, i.e.,

that she had told police in 2002 that Sheila's son "was tested for paternity" and that "Bobby Hall was the father," her testimony at trial was not inconsistent with her prior statement and extrinsic evidence of that prior statement was, therefore, not admissible under Evid.R. 613(B). *See, e.g., Eason*, 1994 Ohio App. LEXIS 4636 at *13.

{¶41} Neither Vickie Scales's response to further questioning by defense counsel that she did not recall what she told police regarding "DNA testing" nor her trial testimony that Bobby Hall was ultimately "ruled out" as Sheila's son's father, negates her acknowledgment on the witness stand that she previously told police that Bobby Hall was his father or establishes a foundation for the admissibility of extrinsic evidence of her prior statements to impeach her testimony under Evid.R. 613(B).

{¶42} Further, Vickie Scales's testimony regarding Sheila's son's paternity was "not a fact of consequence to the determination of the action," i.e., whether Kemp murdered Sheila Scales; it related to a matter collateral to the determination of Kemp's guilt. As such, extrinsic evidence of her prior statement was properly excluded for this reason as well. *See, e.g., State v. Cowen*, 8th Dist. No. 96969, 2012-Ohio-3682, ¶ 24. Accordingly, the trial court did not abuse its discretion in excluding testimony from Detective Entenok regarding Vickie Scales's prior statements. Kemp's second assignment of error is overruled.

## Sufficiency and Manifest Weight of the Evidence

{¶43} In his third and fourth assignments of error, Kemp challenges both the sufficiency and the weight of the evidence presented at trial to support his convictions for

murder and tampering with evidence. He contends that the state's theory that he committed these crimes was not supported by any reliable, credible evidence. Although they involve different standards of review, because they involve interrelated issues and a review of the same evidence, Kemp's third and fourth assignments of error are addressed together.

{¶44} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state has met its burden of production at trial. *State v. Hunter*, 8th Dist. No. 86048, 2006-Ohio-20, ¶ 52. When reviewing sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶45} Kemp was convicted of murder in violation of R.C. 2903.02(A) and tampering with evidence in violation of R.C. 2921.12(A)(1). R.C. 2903.02(A) provides, in relevant part: "No person shall purposely cause the death of another * * *." R.C. 2921.12(A)(1) states:

> No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation.

**{¶46}** Kemp argues that his convictions must be reversed because the state did not establish he had any motive to murder Sheila Scales and because there was no direct testimony or any forensic evidence "linking him to any crime." This court disagrees.

**{¶47}** Proof of motive is not required to sustain a conviction. "[P]roof of motive does not establish guilt, nor does want of proof thereof establish innocence; and, where the guilt of the accused is shown beyond a reasonable doubt, it is immaterial what the motive may have been for the crime, or whether any motive is shown." *State v. Allen*, 8th Dist. No. 85530, 2005-Ohio-4813, ¶ 15, citing *State v. Lancaster*, 167 Ohio St. 391, 149 N.E.2d 157 (1958), paragraph two of the syllabus. Accordingly, the state's failure to establish a clear motive is not a sufficient basis upon which to reverse Kemp's convictions.

**{¶48}** The record reflects that the case against Kemp was based, in large part, on circumstantial evidence. However, guilt may be proved by circumstantial evidence, real evidence, direct evidence — or any combination of the three. *State v. Primeau*, 8th Dist. No. 97901, 2012-Ohio-5172, ¶ 30, citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988); *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492. Circumstantial evidence has no less probative value than direct or testimonial evidence. *Primeau* at ¶ 30, citing *Jenks* at paragraph one of the syllabus. Indeed, circumstantial evidence may, at times, be "more certain, satisfying and persuasive than direct evidence." *State v. Lott*, 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990).

**{¶49}** The Ohio Supreme Court "has 'long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Cassano*, 8th Dist. No. 97228, 2012-Ohio-4047, ¶ 13-15, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990). The question is whether the state presented sufficient evidence that, if believed, would support the jury's convictions of murder and evidence tampering beyond a reasonable doubt, i.e., whether there was sufficient evidence that Kemp "purposely cause[d] the death" of Sheila Scales and "[a]lter[ed], destroy[ed], conceal[ed], or remove[d] any * * * thing, with purpose to impair its value or availability as evidence" knowing that an investigation was "about to be or likely to be instituted."

**{¶50}** In this case, the state presented sufficient "satisfying and persuasive" evidence supporting the jury's determination that Kemp murdered Sheila Scales and engaged in evidence tampering.

**{¶51}** In statements he made to police and others, Kemp admitted that he was at the victim's house at the time of her death and that he destroyed evidence that he knew would be relevant to the subsequent investigation of Sheila's murder.

**{¶52}** Several neighbors, including brothers Douglas and Donald Avery, who knew Kemp, testified to seeing Kemp at the victim's house that evening. Other witnesses observed a van similar to that driven by Kemp at the victim's house and later making erratic, suspicious movements in and around the victim's driveway. No one

was else was identified as having entered or left the victim's home that evening. Investigators testified that there was no sign of any forced entry.

{¶53} Further, Kemp's story regarding the condition in which he claimed to have found the victim did not match the physical evidence that was found at the scene. Whereas Kemp told investigators that when he found the victim, she was still alive, lying in a pool of blood on the dining room floor, investigators testified that, based on the physical evidence, the victim was stabbed in the kitchen and her body dragged from the kitchen into the dining room; the rug on the dining room floor where the victim's body was found contained no blood.

{¶54} In addition, DNA consistent with Kemp's DNA was found underneath the victim's left fingernail. Kemp attempts to minimize the significance of the state's DNA evidence, arguing that it could have resulted from casual contact he had with the victim. However, no other foreign DNA was found. Kemp also points out that 42 other items were tested relating to the case or crime scene and that none contained any DNA from Kemp or any other physical evidence linking Kemp to the crime. However, Kemp told investigators that he threw away the clothes that he was wearing when he was with the victim. These clothes were never recovered. Kemp further admitted to destroying evidence that would have established his presence at the crime scene, including wiping off the back door and front and back door knobs. Accordingly, it is not surprising that there was nothing further from the crime scene that was tested directly linking Kemp to Sheila's murder.

**{¶55}** Kemp also contends that because the victim told Lorna Bates that "her baby's father" was coming over and that DNA testing conducted by the state in 2011 established that Kemp was not the father of the victim's son, there must have been another person in the victim's home the night of the murder who also drove a van and killed her. However, this is not the only inference the jury could have reasonably drawn from the evidence. It is not clear who the victim believed "her baby's father" was at the time she died — whether it was Kemp or someone else.

**{¶56}** Further, Kemp's actions after he claimed to have discovered the victim — his failure to call 911 or EMS, his destruction of evidence at the crime scene, his abnormal behavior following the incident, and the subsequent disappearance of his unusually "super clean" van — are consistent with guilt, not someone who had no role in Sheila's death.

**{¶57}** Kemp asked the jury to believe that during the brief period of time he left the victim's house to get more marijuana, someone else — whom none of the neighbors saw — entered the victim's house, stabbed her numerous times, and then, within a matter of minutes, dragged the still living victim from the kitchen to the dining room, attempted to clean up the blood in the kitchen, and escaped from the house without detection before Kemp came back to witness the victim's final, dying breath. Kemp maintains that because "his story" was "not physically impossible," "consistent within itself," and "consistent with available evidence," the jury lacked a sufficient basis upon which to

convict him. However, the jury was entitled to disbelieve Kemp's implausible version of events.

**{¶58}** As with all circumstantial evidence, nothing in the state's case directly proved that Kemp murdered Sheila Scales. But the state's evidence could well have convinced the jury that "the application of various facts formed a larger picture that, when viewed as [a] whole, made a compelling case for [Kemp's] guilt." *State v. Cassano*, 8th Dist. No. 97228, 2012-Ohio-4047, ¶ 19.

**{¶59}** Viewing the evidence in a light most favorable to the prosecution, we conclude that a rational jury could have found that the essential elements of the crimes of which Kemp was convicted were proven beyond a reasonable doubt.

**{¶60}** We likewise find no merit to Kemp's assertion that the jury's verdict was against the manifest weight of the evidence. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the reviewing court sits as a thirteenth juror and may disagree with the factfinder's resolution of conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed. 2d 652 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In its review, this court remains

mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the jury to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraphs one and two of the syllabus.

**{¶61}** The power to reverse a conviction as against the manifest weight of the evidence must be exercised with caution; a new trial is granted only in the exceptional case in which the evidence weighs heavily against the conviction. *Martin, supra.* This is not that case.

**{¶62}** As detailed above, in this case, the state's witnesses presented credible, consistent testimony linking Kemp to the murder. *State v. Wilson*, 8th Dist. No. 90267, 2008-Ohio-3354, ¶ 34-35. DNA evidence also supported Kemp's convictions. Kemp's version of events was implausible and his actions inconsistent with someone who had no involvement in Sheila Scales's murder.

**{¶63}** Kemp maintains that neighbor Douglas Avery's testimony regarding what he claims to have seen the evening of Sheila's murder was unreliable and should not have been believed because Avery's testimony that he and Kemp attended school together at Lincoln West conflicted with testimony by retired Euclid Police Captain Leonard Nosse that Kemp's family lived down the street from the Nosse family and attended Euclid High School with his son. However, "[a] conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony." *Wade*, 2008-Ohio-4574, at ¶ 38, quoting *State v. Asberry*, 10th Dist. No. 04AP-1113, 2005-Ohio-4547, ¶ 11. The jury was in the best position to weigh the witnesses' credibility. Any inconsistencies in

witness testimony regarding where Kemp may have gone to school more than ten years ago or where Avery may have first come to know Kemp were not of the sort that would lead us to find a manifest miscarriage of justice.

{¶64} The jury weighed credibility and it, as the factfinder, was free to believe all, part, or none of the testimony of each witness. It was well within the province of the jury to credit the version of events offered by the state and to reject the implausible version of events offered by Kemp. After examining the entire record, weighing the evidence, and considering the credibility of the witnesses, we do not find that the jury lost its way or created a manifest miscarriage of justice in convicting Kemp of Sheila Scales's murder and tampering with evidence. The state's case contained substantial evidence upon which the jury could reasonably conclude, beyond a reasonable doubt, that each element of the charged offenses had been established. Accordingly, we overrule Kemp's third and fourth assignments of error.

## Discovery Violation

{¶65} In his fifth assignment of error, Kemp argues that the trial court should have declared a mistrial and dismissed the charges against him based on the state's failure to disclose phone records showing a call from a landline at Kemp's mother's home to the victim's home at around midnight the evening Sheila Scales was murdered. The omission was discovered by defense counsel during his cross-examination of Detective Entenok as he questioned the detective regarding whether police had ever obtained any cell-phone records showing calls from Kemp to the victim the evening of the incident.

The detective responded that they had not obtained Kemp's phone records but did obtain incoming phone records that showed a call from Kemp's mother's house to the victim's house.

{¶66} After eliciting this testimony, Kemp moved for a mistrial. The trial court denied Kemp's request for a mistrial but instructed the jury to disregard the detective's testimony relating to the telephone call.

{¶67} Upon receipt of a written demand for discovery from a defendant, Crim.R. 16(B) requires that the state disclose documents and other materials

> related to the particular case indictment, information, or complaint, and which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant, [that are] within the possession of, or reasonably available to the state.

Crim.R. 16(B). The state did not dispute that the phone records should have been disclosed to Kemp under Crim.R. 16, but claimed that any nondisclosure was simply an "oversight."

{¶68} The trial court has discretion to fashion a remedy for discovery violations that are discovered during trial. Crim.R. 16(L)(1) provides in pertinent part:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule * * * the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

{¶69} "It is within the trial court's sound discretion to decide what sanction to impose for a discovery violation." *State v. Darmond*, 8th Dist. Nos. 96373 and 96374,

2011-Ohio-6160, ¶ 14, citing *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3, 511 N.E.2d 1138 (1987). A trial court's discovery sanction will not be overturned unless it was unreasonable, unconscionable, or arbitrary. *Id.,* citing *State v. Engle*, 166 Ohio App.3d 262, 2006-Ohio-1884, 850 N.E.2d 123, ¶ 7 (3d Dist.).

**{¶70}** As this court has previously explained:

A mistrial should not be ordered in a criminal case merely because some error or irregularity has occurred, unless the substantial rights of the accused adversely are affected * * *. *State v. Reynolds* (1988), 49 Ohio App.3d 27, 33, 550 N.E.2d 490. A mistrial is necessary only when a fair trial no longer is possible. *State v. Franklin* (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1, citing *Illinois v. Somerville* (1973), 410 U.S. 458, 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425. Thus, the essential inquiry on a motion for mistrial is whether the substantial rights of the accused were adversely or materially affected. *State v. Goerndt*, Cuyahoga App. No. 88892, 2007-Ohio-4067, ¶ 21.

* * *

[W]hen the prosecution fails to disclose potentially exculpatory evidence, the trial court must consider the following factors in deciding the appropriate way to ensure the fairness of the proceeding: 1) whether the prosecution's failure to disclose was a willful violation of Crim.R. 16; 2) whether foreknowledge of the evidence would have benefitted the accused in the preparation of his defense; and, 3) whether the accused is prejudiced by admission of the evidence. *State v. Saucedo*, Cuyahoga App. No. 90327, 2008-Ohio-3544, at ¶ 25, citing *State v. Parson* (1983), 6 Ohio St.3d 442, 445, 453 N.E.2d 689. *State v. Smith*, 8th Dist. No. 95541, 2011-Ohio-3581, ¶ 21-24.

**{¶71}** Kemp cites *State v. Larkins*, 8th Dist. No. 85877, 2006-Ohio-90, in support of his position that the trial court should have granted his request for a mistrial and dismissed the charges against him as a sanction for the state's failure to disclose the telephone records. In *Larkins*, this court affirmed the trial court's dismissal of the defendant's indictment as a sanction for the state's violation of Crim.R. 16. The state

had willfully withheld exculpatory material from the defendant, including information that called into question the state's identification of the defendant as the perpetrator, resulting in prejudice to the defendant. *Id.* at ¶ 43-48. The prejudice to the defendant could not be cured by a new trial or other means because nearly twenty years had passed, eight witnesses for the defense were deceased, numerous other witnesses had unknown addresses, and to present the witnesses' prior testimony would have been useless because none of the witnesses had been previously questioned about the exculpatory evidence. *Id.* at ¶ 51. *Larkins* is the "extraordinary case" in which prejudice caused to the defendant as a result of the state's failure to disclose exculpatory evidence could not be cured except by a dismissal. *Id.* This is not such a case.

{¶72} First, there is no evidence in this case that the state's failure to disclose the telephone records was willful. Nor are the telephone records exculpatory. Further, although Kemp asserts it is "quite likely" his defense strategy would "have been different" had the phone records been previously disclosed, we cannot conclude that Kemp was prejudiced. When a trial court has sustained an objection and provided a curative instruction, we must presume — in the absence of any evidence to the contrary — that the jury followed the trial court's instruction. *State v. Allen*, 8th Dist. No. 96014, 2011-Ohio-4821, ¶ 32-33; *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995).

{¶73} The trial court was in the best position to determine which sanction under Crim.R. 16(L) was most appropriate in this case. After hearing the parties' arguments, the trial court chose to exclude the evidence and give a curative instruction to the jury.

We cannot state, based on the record, that the trial court's decision was arbitrary, unreasonable, or unconscionable. *State v. Person*, 174 Ohio App.3d 287, 2007-Ohio-6869, 881 N.E.2d 924, ¶ 12-13 (1st Dist.). Accordingly, Kemp's fifth assignment of error is overruled.

### Sentence

**{¶74}** In his sixth assignment of error, Kemp argues that the trial court erred in sentencing Kemp to "[l]ife in prison with eligibility of parole after 15 years" on the murder count instead of "an indefinite term of fifteen years to life."

**{¶75}** Pursuant to R.C. 2929.02(B)(1), "whoever is convicted of or pleads guilty to murder in violation of section 2903.02 of the Revised Code shall be imprisoned for an indefinite term of fifteen years to life." Accordingly, the sentence imposed by the trial court is contrary to R.C. 2929.02(B)(1); Kemp should have been sentenced to "an indefinite term of fifteen years to life."

**{¶76}** Because the sentence the trial court imposed for murder was contrary to law, Kemp's sixth assignment of error is sustained. Kemp's sentence is reversed and vacated, and the matter is remanded to the trial court for resentencing in accordance with this opinion.

**{¶77}** Convictions affirmed; sentence vacated and remanded for resentencing.

It is ordered that appellee and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for resentencing.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KENNETH A. ROCCO, JUDGE

SEAN C. GALLAGHER, P.J., and
KATHLEEN A. KEOUGH, J., CONCUR