JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Andre Thompson ("Thompson"), appeals his convictions. Finding no merit to the appeal, we affirm.
 {¶ 2} In January 2007, Thompson was charged in a thirteen-count indictment. Counts one and two charged him with the aggravated murder of Reginald Roberson ("Roberson") and contained a three-year firearm specification, a felony murder specification, and a separate mass murder specification for the attempted murders of Carnail Duckworth ("Duckworth"), Christopher Page ("Page"), and Antonio Knott ("Knott"). Counts three, four, seven, and eight charged Thompson with the aggravated robbery of Roberson and Duckworth. Counts five, six, nine, and ten charged him with the aggravated robbery of Page and Knott. Counts eleven, twelve, and thirteen charged him with the attempted murders of Duckworth, Page, and Knott.[1]
 {¶ 3} The matter proceeded to a jury trial in August 2007. During the jury selection process, Thompson moved to suppress the photo array, arguing that the photo identification procedure used by Cleveland police was unnecessarily suggestive. Following the hearing, the trial court denied the motion, finding that Thompson did not meet his burden of establishing that the procedure was unduly suggestive.
 {¶ 4} Because Page was not available at the initial suppression hearing, he was questioned at a later time. After his testimony regarding the photo *Page 4 
array, the trial court again denied Thompson's motion, finding that the identification procedure was not "perfect" with regard to Page, but that the photo array was not unnecessarily suggestive and that there was no likelihood of irreparable mistaken identification based upon the procedure used.
 {¶ 5} The matter then proceeded to a jury trial, where the following evidence was presented.
 {¶ 6} On the evening of December 15, 2006, Roberson, Duckworth, and Knott had performed as male dancers at two dance clubs in Cleveland.[2] Linda Alexander ("Alexander") and her sister, Shaletha Perry ("Perry"), arranged to meet Roberson and his friends, Duckworth, Page, and Knott, at the end of the evening.[3] Alexander picked up her friend, Clarissa Pittman ("Clarissa"), and met Roberson, Duckworth, Page, and Knott at a gas station on Superior Avenue. The group, traveling in three cars, followed Alexander to a house on East 120th Street. They all planned to go to Clarissa's apartment to socialize. However, Clarissa first stopped by her grandmother's house to pick up her keys from her brother, Clarence Pittman ("Clarence"). All three cars parked across the street from Clarissa's grandmother's house. *Page 5 
 {¶ 7} Clarence and Thompson were sitting in a car parked in the driveway. Thompson exited the vehicle, walked to a red van, and retrieved an item from the van. He then walked toward Roberson's vehicle. Thompson wore a jacket with a hood and had a mask covering the lower half of his face.
 {¶ 8} Clarissa, Alexander, and Duckworth were standing outside Roberson's vehicle when Thompson approached and pulled out a gun. Clarissa pushed the gun away and told Thompson to "stop playing." Thompson pushed her out of the way and said, "Ya'll know what it is, give me all you got," and shot at Duckworth.[4] Roberson attempted to drive away, but Thompson fired several shots at Roberson's vehicle, causing Roberson to crash into the red van. Page attempted to assist Duckworth, but Thompson chased him and shot at him as well. Alexander and Page drove to a gas station to call the police.
 {¶ 9} Meanwhile, Knott also exited Duckworth's car to assist Duckworth. Duckworth told him to save himself and run. As Knott ran away, Thompson and another male chased him and shot at him. He called 911 as he ran away. He identified the shooter as the taller of the two men chasing him.
 {¶ 10} Thompson's girlfriend, Michelle Williams ("Williams"), testified that she was in the red van parked on the street. She accompanied Thompson to East 120th Street to buy some marijuana. She stated that Thompson was the only one who came to the van. However, she claimed that Clarence was the *Page 6 
shooter, and that Thompson had told her that Clarence and Clarissa were trying to rob Roberson, Page, Duckworth, and Knott. She fled the scene with Thompson after Roberson's car hit their van.
 {¶ 11} Williams further testified that she called 911. She admitted making a false report that Thompson's van was stolen because she did not want any involvement in the matter. She told police that she was carjacked at gunpoint. She admitted, however, that she failed to tell the police in both of her statements that Clarence was the shooter.
 {¶ 12} The jury found Thompson guilty of the aggravated murder of Roberson as charged in count two of the indictment, with the three-year firearm and felony murder (principal offender) specifications attached. The jury also found Thompson guilty of the aggravated robbery of Roberson and Duckworth, as charged in counts three, four, seven, and eight of the indictment and the attempted murder of Duckworth and Knott, as charged in counts eleven and thirteen of the indictment. Counts five, six, nine, and ten were dismissed by the trial court pursuant to Thompson's Crim. R. 29 motion.
 {¶ 13} At sentencing, the jury recommended that Thompson be sentenced on count two to life imprisonment, with the possibility of parole after serving twenty-five years in prison.[5] The court sentenced Thompson on counts three, *Page 7 
four, seven, eight, eleven, and thirteen. It merged all three-year firearm specifications and sentenced Thompson to ten years in prison on count three and ten years on count four to run concurrently to each other, but consecutively to count two.[6] The court merged counts seven and eight into counts three and four, respectively. Thompson was sentenced to ten years in prison on count eleven, to be served consecutively to counts three and four, and five years on count thirteen, to run consecutively to counts three, four, and eleven, for an aggregate of fifty-three years to life in prison.
 {¶ 14} Thompson appeals, raising five assignments of error. In the first assignment of error, he argues that his convictions are against the manifest weight of the evidence.
 Manifest Weight of Evidence {¶ 15} In evaluating a challenge to the verdict based on the manifest weight of the evidence, a court sits as the thirteenth juror, and intrudes its judgment into proceedings that it finds to be fatally flawed through misrepresentation or misapplication of the evidence by a jury that has "lost its way." State v. Thompkins, 78 Ohio St.3d 380,1997-Ohio-52, 678 N.E.2d 541. As the Ohio Supreme Court declared:
 "Weight of the evidence concerns `the inclination of the greater amount of credible evidence offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of *Page 8 
proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' * * *
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id.
 {¶ 16} In State v. Bruno, Cuyahoga App. No. 84883, 2005-Ohio-1862, we stated that the court must be mindful that the weight of the evidence and the credibility of witnesses are matters primarily for the trier of fact. A reviewing court will not reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the prosecution proved the offense beyond a reasonable doubt. State v.DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus; State v. Eley (1978), 56 Ohio St.2d 169, 383 N.E.2d 132. Moreover, in reviewing a claim that a conviction is against the manifest weight of the evidence, the conviction cannot be reversed unless it is obvious that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Garrow (1995), 103 Ohio App.3d 368,659 N.E.2d 814.
 {¶ 17} Thompson argues that his convictions for aggravated murder, attempted murder, and aggravated robbery are against the manifest weight of the evidence because there was no credible direct identification of Thompson as the shooter. *Page 9 
He claims that all of the independent witnesses provided various descriptions of the shooter that described Clarence as the actual shooter, not Thompson.
 {¶ 18} However, a review of the record reveals that all of the witnesses who knew Thompson identified him as the shooter. Clarissa testified that she had known Thompson for approximately ten years and that he is Clarence's friend. She observed Thompson approach her with a gun as she stood next to Roberson's vehicle. She recognized his voice and stated that he was wearing a black or blue one-piece work suit with a tan jacket over it. She also stated that Thompson wore a hoodie and a mask that covered the lower half of his face. She described Thompson as five feet nine inches to six feet tall.
 {¶ 19} Alexander testified that she recognized Thompson from the neighborhood. She was standing outside Roberson's car when Thompson approached with a gun. He shot Duckworth, and she ran away. She described the shooter as five feet nine inches tall and wearing a blue or black jumpsuit and mask.
 {¶ 20} Se'Anna Payne and Chantae Payne (collectively referred to as "the Paynes"), Clarissa and Clarence's cousins, testified that they lived with their grandmother on East 120th Street. They had known Thompson all their lives and observed him commit the shooting.
 {¶ 21} Clarence testified that he was smoking marijuana with Thompson when the group arrived at his grandmother's house. He saw Thompson walk to *Page 10 
the van and then toward his sister and the group standing outside. Thompson fired shots at Roberson's vehicle. Clarence stated that Thompson wore green and tan that night and a black hoodie, but Clarence denied that Thompson wore a mask. He estimated Thompson's height as five feet two inches.
 {¶ 22} Duckworth testified that he did not know Thompson prior to the shooting. He was standing outside Roberson's car, when Thompson shot at him and then at Roberson's car. He described the shooter as five feet ten inches tall, wearing a mask and tan jacket and hood. When police provided two photo arrays, Duckworth made his selection in each array based on the eyes of the individuals in the photos. He selected Thompson as the shooter in one array and chose another male in the second array.
 {¶ 23} Detective Michael Smith ("Det. Smith") of the Cleveland police explained that Duckworth was shown two photo arrays to eliminate Clarence as a suspect. Det. Smith testified that only one of the arrays included Thompson's picture. Duckworth correctly identified Thompson as the shooter because he remembered that the shooter's eyes were "red" and Thompson's eyes in the array picture were red. In the array without Thompson's picture, Duckworth selected a male whom he thought "looked closer" to Thompson.
 {¶ 24} Page testified that he was sitting in the front passenger seat of Duckworth's parked car when he observed the shooter walk to a red van or truck and then walk over to Roberson's car and start shooting. He described the *Page 11 
shooter as about six feet tall and wearing a black hoodie and blue jeans. He also stated that the shooter was wearing a mask, at one point. Page was shown a single photograph and a photo array in which he identified Thompson as the shooter. He recognized Thompson because of his face and eyebrows.
 {¶ 25} Knott testified that two males were chasing him. He described one man as taller than the other. He claimed that the taller man had the gun. The record reveals that Thompson is taller than Clarence.
 {¶ 26} Although there are varying descriptions of the shooter in terms of height and weight, all of the witnesses selected Thompson's photo from the arrays as the shooter. Duckworth identified Thompson as the shooter because he remembered that the shooter's eyes were "red," and Thompson's eyes in the photo array were red.
 {¶ 27} Furthermore, other than the victims, all of the witnesses had known Thompson for a significant period of time. Clarence, the Paynes, and Page testified that they saw Thompson before he put on a mask. Furthermore, the witnesses testified to the same sequence of events leading up to the shooting. The shooter first walked to a red van and retrieved an item from the van. The shooter then walked toward Roberson's vehicle and shot at Duckworth and Roberson. The evidence in the record revealed that the red van was registered to Thompson. Williams testified that the only person who came to the van was Thompson. She reported the van as stolen to separate herself from the incident. *Page 12 
 {¶ 28} Therefore, based on the above evidence, we find that the jury did not lose its way or create such a manifest miscarriage of justice as to require reversal of the convictions. Thus, we find that Thompson's convictions are not against the manifest weight of the evidence.
 {¶ 29} Accordingly, the first assignment of error is overruled.
Motion to Suppress
 {¶ 30} In the second assignment of error, Thompson argues that the trial court erred in denying his motion to suppress the photo array and the witnesses' identification testimony. Thompson contends that the court abused its discretion in permitting overly suggestive investigative techniques. He claims that the identification procedure used by Det. Smith was suggestive because the detective advised Duckworth, prior to making the identification, that the suspect was in custody. He also claims that the only evidence that identified him as the shooter came from Clarissa and Clarence, whom he claims were involved in the crime.
 {¶ 31} This court set forth the scope of our review regarding a motion to suppress in State v. Curry (1994), 95 Ohio App.3d 93, 96,641 N.E.2d 1172, as follows:
 "In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility. State v. Clay
(1973), 34 Ohio St.2d 250, 298 N.E.2d 137. A reviewing court is bound to accept those findings of fact if supported by competent, credible evidence. See State v. Schiebel (1990), *Page 13 55 Ohio St.3d 71, 564 N.E.2d 54. However, without deference to the trial court's conclusion, it must be determined independently whether, as a matter of law, the facts meet the appropriate legal standard. State v. Claytor (1993), 85 Ohio App.3d 623,627, 620 N.E.2d 906, 908."
 {¶ 32} We note that courts apply a two-prong test in determining the admissibility of challenged identification testimony. First, the defendant bears the burden of demonstrating that the identification procedure was unnecessarily suggestive. If this burden is met, the court must then consider whether the procedure was so unduly suggestive as to give rise to irreparable mistaken identification. State v. Page, Cuyahoga App. No. 84341, 2005-Ohio-1493, citing Manson v.Brathwaite (1977), 432 U.S. 98, 114, 53 L.Ed.2d 140, 97 S.Ct. 2243. "Stated differently, the issue is whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure." State v. Wills (1997), 120 Ohio App.3d 320,324-325, 697 N.E.2d 1072,
 {¶ 33} The Supreme Court has set forth the following factors to consider regarding potential misidentification:
 "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation ***." Neil v. Biggers (1972), 409 U.S. 188, 199-200, 34 L.Ed.2d 401, 93 S.Ct. 375.
 {¶ 34} The court must review these factors under the totality of the circumstances. Id. Furthermore, "although the identification procedure may have contained notable flaws, this factor does not, per se, preclude the *Page 14 
admissibility of the identification." Page, citing State v.Merrill (1984), 22 Ohio App.3d 119, 121, 489 N.E.2d 1057; State v.Moody (1978) 55 Ohio St.2d 64, 67, 377 N.E.2d 1008.
 {¶ 35} Thus, our first step is to determine whether Thompson has established that the identification procedure was unreasonably suggestive. In the instant case, Det. Smith conducted the investigation of Roberson's murder. The police established Thompson as the suspect after interviewing the witnesses.
 {¶ 36} Det. Smith and another detective created several photo arrays including Thompson. They selected photos of individuals who looked similar to Thompson. Det. Smith also testified that prior to showing the array, he did nothing to suggest which photo to select, nor did he tell the witnesses that the shooter would be in the photo array.
 {¶ 37} A review of the suppression hearing reveals that Clarissa, Alexander, Clarence, and the Paynes identified Thompson's photo as the shooter. These witnesses testified that no one told them whom to pick or whether the shooter was in the photo array. Furthermore, the witnesses were not shown the same array, but each witness nevertheless identified Thompson as the shooter.
 {¶ 38} Duckworth was shown two photo arrays. Det. Smith testified that two photo arrays were used so police could eliminate Clarence as a suspect. Only one of the arrays contained Thompson's photo. Duckworth identified *Page 15 
Thompson as the shooter because he recalled that the shooter's eyes were "red," and Thompson's eyes in the photo array were red. In the photo array without Thompson's photo, Duckworth selected a male whom he thought "looked closer" to Thompson and made this selection based on the "eyes."
 {¶ 39} Page was shown a photo array in which he identified Thompson as the shooter. However, the identification was not unequivocal. He selected Thompson's photo because he felt that the face and eyebrows resembled the shooter's. Page was later shown a single photo of Thompson, and he identified Thompson as the shooter.
 {¶ 40} The court denied Thompson's motion to suppress, finding that the photographic procedure was not unnecessarily suggestive. The court noted that the photos in the arrays contained six African-American males of similar age with similar facial features, skin tone, and hairstyle. We agree with the trial court's finding in that there is nothing in the arrays that distinguishes Thompson from the others.
 {¶ 41} Furthermore, with respect to Page's identification, we find that the identification process with the single photo did not give rise to a substantial likelihood of unreliable identification. Moreover, in viewing the totality of the circumstances, we find that Page's identification is reliable. Page observed a red van at the scene, and he observed the shooter walk toward the van without a mask on, retrieve something, and then saw him wearing a mask. *Page 16 
 {¶ 42} Thus, Thompson failed to satisfy his burden of demonstrating that the identification procedure was suggestive. Accordingly, we find that the trial court's denial of the motion to suppress is supported by competent credible evidence.
 {¶ 43} Therefore, the second assignment of error is overruled.
 Motion for Mistrial {¶ 44} In the third assignment of error, Thompson argues that the court abused its discretion in denying his motion for a mistrial because the State did not have a good faith basis to ask Duckworth if Clarissa told the shooter, "Dre, stop playing, go back in the house."
 {¶ 45} The standard of review for evaluating the trial court's decision on a motion for a mistrial is an abuse of discretion.Cleveland v. Gonzalez, Cuyahoga App. No. 85070, 2005-Ohio-4413;State v. Garner, 74 Ohio St.3d 49, 59, 1995-Ohio-168, 656 N.E.2d 623;State v. Glover (1988), 35 Ohio St.3d 18, 517 N.E.2d 900. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St. 3d 217, 219,450 N.E.2d 1140, quoting State v. Adams (1980), 62 Ohio St.2d 151, 157,404 N.E.2d 144.
 {¶ 46} A mistrial should not be ordered in a criminal case merely because some error or irregularity has occurred, unless the substantial rights of the accused or the prosecution are adversely affected, and this determination is made at the *Page 17 
discretion of the trial court. State v. Reynolds (1988),49 Ohio App.3d 27, 33, 550 N.E.2d 490. The granting of a mistrial is only necessary when a fair trial is no longer possible. State v.Franklin (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1, citingIllinois v. Somerville (1973), 410 U.S. 458, 462-463, 93 S.Ct. 1066,35 L.Ed.2d 425. Thus, the essential inquiry on a motion for mistrial is whether the substantial rights of the accused are adversely or materially affected. State v. Goerndt, Cuyahoga App. No. 88892,2007-Ohio-4067.
 {¶ 47} Thompson argues that there was no good faith discovery to show that Clarissa used the name Dre, as a nickname for Thompson. As a result, the trial court should have declared a mistrial. We disagree.
 {¶ 48} After reviewing the record, we find that the trial court did not abuse its discretion by denying Thompson's motion for a mistrial. On direct examination, Duckworth testified that he recalled Clarissa calling the shooter by his name, but he could not remember the name. On cross-examination, Duckworth was asked if Clarissa could have said "Boy," which is Clarence's nickname. Again Duckworth testified that he could not remember what name she used. Then on redirect, Duckworth was asked if Clarissa could have used the name "Dre." Initially Duckworth testified that she said "Dre," but then he admitted he could not be certain which name Clarissa used. The State then asked Duckworth if he was given a choice, which nickname would he choose. Defense counsel objected, and the trial court directed the State to "Move on." *Page 18 
 {¶ 49} Defense counsel argued that the State had no good faith basis to ask this question. The State argued that it obtained this information from an interview with Duckworth. The court then stated, "If that was a motion for a mistrial, it's denied."
 {¶ 50} In the instant case, the State's questioning was in response to Duckworth's cross-examination. However, Duckworth never definitely admitted what name Clarissa used. Therefore, we find that Thompson's substantial rights were not adversely or materially affected.
 {¶ 51} Accordingly, the third assignment of error is overruled.
 Failure to Strike Testimony {¶ 52} In the fourth assignment of error, Thompson argues that the trial court erred in failing to strike Clarence's testimony.
 {¶ 53} We note that a trial court enjoys broad discretion in admitting evidence. State v. Long (1978), 53 Ohio St.2d 91, 98, 372 N.E.2d 804. An appellate court will not disturb the exercise of that discretion absent an abuse of discretion. Long, citing State v. Hymore (1967),9 Ohio St.2d 122, 128, 224 N.E.2d 126, certiorari denied, 390 U.S. 1024. See, also, State v. Wilson, Cuyahoga App. No. 87429, 2006-Ohio-5253.
 {¶ 54} Thompson argues that the court abused its discretion in failing to strike Clarence's testimony because he was one of the suspected shooters, and he *Page 19 
argues Clarence is "the only individual on the street who positively identifies [Thompson] as the shooter * * *."
 {¶ 55} We find that Thompson's argument lacks merit. In the instant case, Clarence, Clarissa, Alexander, and the Paynes all positively identified Thompson as the shooter. Furthermore, Duckworth selected Thompson from the photo array because his eyes were red.
 {¶ 56} Thompson also argues that Clarence's testimony was prejudicial because Clarence admitted lying and admitted that he smoked marijuana and drank beer before testifying at trial.
 {¶ 57} Although Clarence admitted being a drug dealer and claimed at times that he was lying, his testimony regarding the incident was corroborated by the other witnesses' testimony. He testified that Thompson first went to the red van, then walked toward the crowd of people on the street, and then fired shots at them.
 {¶ 58} In addition, the trial court determined that Clarence was not "under the influence" at the time he testified. The court believed that he was a "difficult" witness.
 {¶ 59} Because the credibility of witnesses is a matter primarily for the trier of fact and Thompson has failed to demonstrate how the trial court's denial was arbitrary, capricious, or unreasonable, we find that the trial court did not *Page 20 
abuse its discretion in denying Thompson's motion to strike Clarence's testimony.
 {¶ 60} Thus, the fourth assignment of error is overruled.
 Ineffective Assistance of Counsel {¶ 61} In the fifth assignment of error, Thompson argues he was denied effective assistance of counsel when defense counsel failed to voir dire Clarence.
 {¶ 62} In a claim of ineffective assistance of counsel, the burden is on the defendant to establish that counsel's performance fell below an objective standard of reasonable representation and prejudiced the defense. State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus; Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674.
 {¶ 63} To determine whether counsel was ineffective, Thompson must show that: (1) "counsel's performance was deficient," in that "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment," and (2) counsel's "deficient performance prejudiced the defense" in that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland.
 {¶ 64} In Ohio, a properly licensed attorney is presumed competent.Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 301, 209 N.E.2d 164. In evaluating whether a petitioner has been denied the effective assistance of counsel, the Ohio Supreme Court held that the test is "whether the accused, under all the circumstances, *** had *Page 21 
a fair trial and substantial justice was done." State v. Hester
(1976), 45 Ohio St.2d 71, 341 N.E.2d 304, paragraph four of the syllabus.
 {¶ 65} When making that evaluation, a court must determine "whether there has been a substantial violation of any of defense counsel's essential duties to his client" and "whether the defense was prejudiced by counsel's ineffectiveness." State v. Lytle (1976), 48 Ohio St.2d 391,358 N.E.2d 623; State v. Calhoun, 86 Ohio St.3d 279, 289, 1999-Ohio-102,714 N.E.2d 905. To show that a defendant has been prejudiced, the defendant must prove "that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Bradley, at paragraph three of the syllabus;Strickland.
 {¶ 66} We find that Thompson is unable to prove either prong of theStrickland test. His sole argument under this assignment of error is that but for counsel's failure to properly voir dire Clarence, a real probability exists that he would not have been convicted. However, a review of the record reveals that defense counsel had the opportunity to cross-examine Clarence during his suppression hearing, which was conducted before trial began. Furthermore, the trial court noted that Clarence's demeanor was no different than it was during the suppression hearing.
 {¶ 67} Because we found no abuse of discretion in the court's allowing Clarence's testimony, we find no ineffectiveness by counsel.
 {¶ 68} Therefore, the fifth assignment of error is overruled. *Page 22 
 {¶ 69} Accordingly, judgment is affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., J., and JAMES D. SWEENEY, J.*, CONCUR.
[1] Counts three through thirteen each carried a three-year firearm specification.
[2] Page is also a male dancer, but did not perform that night. He accompanied Roberson, Duckworth, and Knott to the two clubs.
[3] Alexander was romantically involved with Roberson.
[4] Thompson was also referred to as Dude, Ben, and Dre.
[5] The three-year firearm specification was to be served prior to and consecutive with the life sentence on count two.
[6] Thompson was also found guilty of each three-year firearm specification attached to counts three, four, seven, eight, eleven, and thirteen.
* SITTING BY ASSIGNMENT: JUDGE JAMES D. SWEENEY, RETIRED, OF THE EIGHTH DISTRICT COURT OF APPEALS. *Page 1