[Cite as *State v. Bryson*, 2013-Ohio-934.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 98298**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# ALAN BRYSON

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-551263

**BEFORE:** Jones, P.J., Keough, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** March 14, 2013

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1350 Standard Building
1370 Ontario Street
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Margaret A. Troia
        Mahmoud Awadallah
Assistant County Prosecutors
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., P.J.:

{¶1} Defendant-appellant, Alan Bryson, appeals the trial court's judgment denying his motion to suppress and the judgment of conviction for aggravated murder. We affirm.

I.

{¶2} Bryson was charged with the aggravated murder of Angelo Lyons. The indictment against him also included one- and three-year firearm specifications, a notice of prior conviction, and repeat violent offender specifications.

{¶3} Bryson filed a motion to "voir dire identification witnesses" and a motion to "suppress in-court and out-of-court identifications." A hearing was held on the motions, at the conclusion of which the motion to suppress was denied. The aggravated murder charge and firearm specifications proceeded to a jury trial; the repeat violent offender and notice of prior conviction specifications were tried to the bench.

{¶4} At the conclusion of the state's case, the defense moved for a Crim.R. 29 judgment of acquittal, which the trial court denied. The defense did not present any testimony. Its renewed Crim.R. 29 motion was denied.

{¶5} The jury was instructed on aggravated murder and murder. It was also instructed on transferred intent. After its deliberations, the jury found Bryson guilty of aggravated murder with the one- and three-year firearm specifications. The trial court found him guilty of the repeat violent offender and notice of prior conviction specifications. Bryson was sentenced to 33 years to life in prison.

## II.

{¶6} The victim, Angelo Lyons, was shot to death outside of the China House Restaurant and Bar on St. Clair Avenue and East 53rd Street in Cleveland. It was undisputed that Bryson was at the establishment on the evening of the shooting. At the time, Bryson had a written tattoo under his left eye. There was one eyewitness to the crime, Lyons's friend Jovelle Lee, who identified Bryson as the perpetrator. No evidence was presented that Lee had been previously acquainted with Bryson, and Lee denied that he was. On the evening of the shooting, Lee described the suspect as a black male wearing a white colored hat, white colored jacket, with a tattoo of writing under his left eye.

{¶7} No physical evidence tied Bryson to the shooting. There were other men in the bar that evening who were dressed similarly to Bryson. The defense's position was that Bryson was a victim of mistaken identity; within that position was the defense's contention that Bryson had been selected from an unduly suggestive photo array and identification procedure.

A. Suppression and Voir Dire Hearing Testimony

{¶8} The lead detective, Raymond Diaz, testified that it was released to the public that the suspect had a written tattoo under his left eye. The detective testified that, through anonymous calls, he initially had the name "A. Hood" or "J. Hood" as a possible suspect.

{¶9} The detective received a call from "Laura" Ross,[1] who said she had something "extremely important" to talk to him about. Diaz interviewed Ross approximately a week after the shooting, and she told him that she was at the bar on the evening of the shooting and had seen Bryson there. She further told the detective that Bryson's "street name" was "A. Hood."

{¶10} Detective Diaz testified that, per custom of the police department, he had the department's photo lab prepare a "six pack" photo array, with one of the photos being Bryson's. Diaz was not pleased with the lab's photo array, however, so he prepared his own.

{¶11} The detective testified that the lab's array had only one other male (besides Bryson) with a tattoo. He "wanted to make it harder for this person [Lee] to pick." Although Diaz could not find any photos of suspects with facial tattoos of words, he prepared an array in which all the other five males had tattoos; three had tattoos on their faces and two had tattoos around the neck area. The array was presented to Lee approximately two weeks after the shooting and was done so by a "blind administrator," Detective Kathleen Carlin. Both Carlin and Diaz testified that Carlin was alone in the room with Lee when the array was presented to him.

{¶12} Carlin testified that a blind administrator is a person who has no knowledge whatsoever of the case, including the circumstances of the incident, the victim(s), or the

---

[1]Ross is named as "Laura" at the suppression hearing. She testified at trial, and her first name is "Alora."

suspect(s). As such, the administrator "blindly" presents the array, not even knowing if the suspect is in the array. Carlin testified that she did not have any discussion with Lee, other than to read to him the instructions from the standard blind administrator form. The instructions were as follows:

> I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. I do not know who the suspect is. Keep in mind that hair styles, beards, and moustaches may be easily changed. Also, photographs may not always depict the true complexion of a person; it may be lighter or darker than shown in the photo. Pay no attention to any markings or numbers that may appear on the photos or any other differences in the type or style of the photographs. When you have looked at all of the photos, tell me whether or not you see any person you recognize. Do not tell other witnesses that you have or have not identified anyone.

State's Exhibit 2.

{¶13} Carlin testified that upon showing the array to Lee, he "immediately" or "within seconds" picked Bryson. Lee told her that he "recognized" Bryson by the tattoo and that Bryson "resembled" the shooter, but the shooter had been wearing a hat. Those comments were noted under the "Remarks" section of the form. Lee reviewed and signed the form. Carlin testified that she did not indicate anything to Lee after he made his identification and her involvement in the case was then over.

{¶14} Lee was voir dired at the hearing. According to Lee, Detective Diaz was in the room when the array was presented to him, and Detective Carlin was there as a "witness," but he could not remember who actually showed him the array. Lee also testified that he did not recall the instructions being read to him before the array was

presented.   Nonetheless, Lee testified that (1) no one told him who to pick, (2) no one indicated if his pick was right, (3) he did not know whether anyone had been apprehended for the shooting, and (4) the police did not give him any information about the case after he made his identification.

{¶15} On this testimony, the trial court denied Bryson's motion to suppress the identification.   The court examined the photo array and found that it was not inherently suggestive.   The court noted that Lee was "highly emotional on the stand and there were aspects of his presentation which suggested perhaps some confusion about the context which he was presented the photo array."

{¶16} The court found that there were two deficiencies with the execution of the blind administrator form, those being, no notation of (1) the specific time the array was presented, and (2) whether other persons (besides Detective Carlin) were present.   But the court found that, under R.C. 2933.82, those deficiencies could be argued to the jury.

B.   Trial Testimony

{¶17} The trial testimony established that in the later part of the evenings, the China House operates more as a bar than a restaurant, and that was the case at the time in question here.   There were three functioning cameras inside the bar on the evening of the shooting; there was one outside camera, which captured the back area of the bar, but there was no outside camera in the front of the bar, where the shooting occurred.

{¶18} Bossan Wagner, Lyons's brother, testified that he and Lyons were at a family event earlier in the evening and left together, along with his cousin. As he was driving Lyons home, Lyons got a call on his cell phone and asked Wagner to drive him to the China House, which Wagner did. Upon arriving at the bar, Wagner parked his car and Lyons got out. Lyons told Wagner that one of his tires was low, so Wagner pumped up the tire with a portable air compressor he had, while Lyons went inside the bar. The cousin remained in the car, and was watching television with a portable device.

{¶19} Meanwhile, inside the bar, Alora Ross was there with some girlfriends, and saw Bryson, whom she described as a "best friend." Ross and Bryson greeted each other. Ross asked Bryson for five dollars, but Bryson said he did not have it and told her he was getting ready to go to Detroit. Ross did not see Bryson leave the bar. Ross testified that there was not any type of altercation in the bar that evening, and her testimony was corroborated by the bar's owner, who was also there that evening, as well as the video recordings admitted into evidence.

{¶20} Ross further testified that Bryson was wearing a white hat and white jacket. She identified him in the surveillance video and admitted that earlier in the evening he had a gray shirt on over a white shirt, but later in the evening he just had the white shirt on (still with the white jacket and hat). She also testified that there were other men in the bar that evening wearing white, including a white hat, and even mistakenly identified another man as Bryson while being shown the surveillance video at trial.

{¶21} Lyons and Lee were also in the bar. Lee testified that he was Lyons's

friend of 20 years. Lee had been drinking, but denied having been intoxicated. At one point, he and Lyons wanted to smoke, and having been earlier reprimanded by the bar's owner for smoking inside, the two headed outside through the front door. Lee testified that he was a step in front of Lyons as they headed out the door. The evidence showed that there were lights right outside the front door of the bar where the shooting occurred.

{¶22} Lee testified that upon walking outside, he and Lyons encountered a man who said something to the effect of, "don't you remember me from jail?" Lee testified that he looked at the man, and not recognizing him, looked back at Lyons to see if Lyons knew him.

{¶23} According to Lee, Lyons looked "startled" or "bothered" by the man's question. When Lee looked back at the man, he saw him raising a gun. The man then fired the gun, momentarily blinding and deafening Lee. Lee testified that he did not see which way the shooter or Lyons went, and he (Lee) went back into the bar looking for Lyons.

{¶24} Lee was shown the surveillance video at trial and identified Bryson in the video as the shooter he and Lyons had encountered.

{¶25} Wagner, who had driven Lyons to the bar but remained outside pumping his tire, testified that Lyons had been in the bar for approximately ten to 15 minutes when he came out with Lee. Lyons asked Wagner if he was ready, and Wagner said he was almost done and turned his back to Lyons and Lee to finish pumping his tire. Wagner testified that he then heard a gunshot and when he turned back around he did not see

Lyons or Lee. Wagner did, however, see a man running away from the scene. He described the man as wearing a light-colored or white jacket and a white hat. The cousin, who had been in the car watching television, did not see the suspect.

{¶26} The evidence showed that Lyons had run for a short distance on E. 53rd Street before collapsing. Police and emergency officials responded to the scene. Lyons was transported by ambulance to the hospital, where he was pronounced dead.

{¶27} One of the first responders to the scene, Officer Julio DeJesus, found a spent .45 caliber shell casing near the front door of the China House. Detective James Raynard, a crime scene technician, processed the scene. He recovered the spent shell casing near the front door of the China House that night, and upon his return to the scene approximately one week later, he recovered a spent bullet on the sidewalk at the corner of E. 53rd Street and St. Clair.

{¶28} Neither Bryson's DNA or fingerprints were detected on the bullet or casing, and the murder weapon was never recovered.

{¶29} Another official who responded to the scene was Officer Roland Brown. Wagner identified Lee to the officer as a potential witness; the officer secured Lee in a patrol car so that he could talk to him. Brown testified that, initially, Lee was not cooperative. For example, when he asked Lee if he would recognize the shooter if he saw him again, Lee did not respond. After a couple of minutes, however, Lee started providing information to Brown. Lee described the shooter to Brown, and said that he had a tattoo on his face and was wearing a white jacket and hat. Officer Brown testified

that he could smell alcohol on Lee, but that Lee did not appear to be impaired.

**{¶30}** Detective Diaz also spoke with Lee that evening, and testified that he was initially "semi-argumentative." Diaz testified that after he allowed Lee to "calm down," he was cooperative.

**{¶31}** Lee testified that he did not initially cooperate with the police because he was more concerned about Lyons, and wanted to go to the hospital to see him.

**{¶32}** Detective Diaz also testified, consistent with his testimony at the suppression hearing, about his initial investigation and learning of a possible suspect with the street name of "J. Hood" or "A. Hood," and subsequently of Bryson. Diaz also testified, again consistent with his prior testimony, about the photo array that was used in this case.

**{¶33}** Approximately two weeks after the shooting, Lee identified Bryson from the photo array as the shooter. Consistent with his testimony during the suppression and voir dire hearing, Lee testified at trial that no one suggested to him who to select during the identification procedure. Lee also provided an in-court identification of Bryson as the shooter.

**{¶34}** Detective Diaz interviewed Bryson after he was arrested and advised him of his *Miranda* rights. Bryson stated that he had been at the China House the evening of the shooting and was wearing a white hat, white polo jacket, and a gray shirt. Bryson told the detective that he saw another man in the bar that evening with a tattoo similar to his, but admitted that that man was not dressed the same as he was.

{¶35} Bryson also told Detective Diaz that he had gone to the China House that evening with some friends and had also left with them. An outside surveillance camera from a nearby business captured Bryson and a group of people walking toward the China House earlier in the evening. The camera also captured the group Bryson had earlier been seen with later in the evening, shortly before the shooting; Bryson was not in the group. Further, the surveillance camera in the China House captured Bryson by himself in the bar in the moments leading up to the shooting.

{¶36} The surveillance tape showed that in the earlier part of the evening, Bryson was wearing a gray shirt over a white shirt, and had on a white jacket and white hat. At one point in the video, Bryson was sitting at a table with three other males when Lyons approached the table. Lyons physically greeted (i.e., something to the effect of a handshake) the three men Bryson was with, but not Bryson. When Lyons walked away from the table, Bryson turned and looked in the direction he was walking.

{¶37} Shortly thereafter, Bryson was not captured by the surveillance cameras. Later in the video, however, very shortly before the shooting, Bryson was recorded wearing a white shirt, without the gray shirt, a white jacket, and a white hat. The video did not capture Bryson leaving the bar, but in the moments prior to the shooting, he was not recorded. He was also not recorded in the moments after the shooting, where the video showed the majority of the patrons fleeing the bar via the back door.

{¶38} On this evidence, the jury found Bryson guilty of aggravated murder and the accompanying firearm specifications.

III.

**{¶39}** Bryson raises the following two assignments of error for our review:

[I.] The trial court erred in its denial of defendant's motion to suppress identification evidence from an overly-suggestive photo array, which violated his due process rights.

[II.] The verdict [was] issued on insufficient evidence, because the prosecution did not present facts that established all of the essential elements of aggravated murder beyond a reasonable doubt.

A.   Motion to Suppress

**{¶40}** A motion to suppress presents a mixed question of law and fact.   *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.   Consequently, we give deference to the trial judge's factual findings, but we review the application of law to fact de novo.   *Id.*; *see also State v. Davis*, 8th Dist. No. 83033, 2004-Ohio-1908.

**{¶41}** In *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the United States Supreme Court held that an identification derived from unnecessarily suggestive procedures, which have a likelihood of leading to a misidentification, violates a defendant's right to due process.

**{¶42}** In determining the admissibility of challenged identification testimony, a reviewing court applies a two-prong test:   (1) did the defendant demonstrate that the identification procedure was unduly suggestive; and, if so, (2) whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character.   *State v. Harris*, 2d Dist. No. 19796, 2004-Ohio-3570, ¶ 19; *see also State v. Thompson*, 8th Dist. No. 90606, 2009-Ohio-615, ¶ 32, citing *State v. Page*, 8th Dist. No. 84341,

2005-Ohio-1493.

{¶43} A photo array, "created by police prior to the victim [or witness] giving a description of the suspect, * * * is not unreasonably suggestive, as long as the array contains individuals with features similar to the suspect." *State v. Jones*, 8th Dist. No. 85025, 2005-Ohio-2620, ¶ 15. Where the other men depicted in the photo array with the defendant all appeared relatively similar in age, features, skin tone, facial hair, dress, and photo background, the photo array was not impermissibly suggestive. *State v. Jacobs*, 7th Dist. No. 99-CA-110, 2002-Ohio-5240, ¶ 18; *State v. Lampkin*, 6th Dist. No. L-09-1270, 2010-Ohio-4934.

{¶44} Bryson challenges Detective Diaz's rejection of the first photo array compiled by the department's photo lab, and his use instead of an array he compiled on his own. We find nothing improper with that. Detective Bryson testified that he was not pleased with the array compiled by the lab because it had only one other male, besides Bryson, with a tattoo. Thus, in his attempt to "make it harder" for Lee to pick, he compiled another array.

{¶45} Detective Diaz testified that he could not find any photos of suspects with written facial tattoos in compiling his array, but he was able to prepare an array in which all of the other five males had tattoos generally — three had tattoos on their faces and two had tattoos around their neck areas. In other words, Detective Diaz compiled an array that he believed would not be suggestive.

{¶46} Bryson further contends that Detective Diaz "arbitrarily narrow[ed] his

scope to less than 200 known criminals." We disagree that the detective's scope was arbitrarily or impermissibly narrowed. The detective was not required to comb through the "hundreds of thousands" of available photos to compile his array. Diaz testified that he concentrated on photos of males who were within two or three years of Bryson's age, had similar complexion, hair styles, and facial tattoos as Bryson. The array shown to Lee contained three individuals with facial tattoos (excluding Bryson) and two with tattoos around their neck areas.

{¶47} "A defendant in a lineup need not be surrounded by people nearly identical in appearance." *State v. Davis*, 76 Ohio St.3d 107, 112, 666 N.E.2d 1099 (1996). Upon review of the array, we do not find that it was unduly suggestive. The five other men in the photo array with Bryson all appear relatively similar to him in age, features, skin tone, and facial hair.

{¶48} Moreover, the record supports that the identification was reliable. Lee testified that he looked directly at Bryson because Bryson had asked "don't you remember me from jail?" Further, there were lights right outside the bar's door where the shooting occurred. And Detective Carlin testified that, upon being shown the photo array, Lee "immediately" or "within seconds" identified Bryson as the shooter.

{¶49} We also do not find that the procedure by which the array was presented to Lee was unduly suggestive. R.C. 2933.83 governs eyewitness identification procedures in lineups. Subsection (B)(1) of the statute provides in part that "[u]nless impracticable, a blind or blinded administrator shall conduct the live lineup or photo lineup." A blind

administrator "means the administrator does not know the identity of the suspect." R.C. 2933.83(A)(2). "If a blind administrator is conducting the live lineup or the photo lineup, the administrator shall inform the eyewitness that the suspect may or may not be in the lineup and that the administrator does not know who the suspect is." R.C. 2933.83(B)(5).

{¶50} Detective Carlin served as the blind administrator in presenting the photo array to Lee. Carlin testified that she had no discussion with Lee, other than to read to him the instructions from the standard blind administrator form. By those instructions, Lee was advised, in part, that (1) the suspect may or may not be in the array, and (2) Carlin did not know who the suspect was.

{¶51} As already mentioned, Lee "immediately" or "within seconds" identified Bryson as the shooter. Lee testified that (1) no one told him who to pick, (2) no one indicated if his pick was right, (3) he did not know whether anyone had been apprehended for the shooting, and (4) the police did not give him any information about the case after he made his identification.

{¶52} On this record, Bryson has failed to demonstrate the first prong for challenging identification testimony, that is that the procedure was unduly suggestive. Because Bryson has failed to demonstrate the first prong, we need not consider the second prong of whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character.

{¶53} Bryson further contends that the trial court "summarily" denied his motion

to suppress, without "reasoned consideration or articulated discussion" as to why. We disagree.

**{¶54}** In denying the motion to suppress, the court noted that it "carefully considered" the motion after reviewing the photo array and the blind administrator form, and taking into account the testimony presented at the hearing. The court further noted that Lee was "highly emotional on the stand and there were aspects of his presentation which suggested perhaps some confusion about the context which he was presented the photo array." But the court stated that Lee's and the police's differing testimonies about who was present during the photo array and whether the instructions were read to him would be an issue that the defense could address with the jury.

**{¶55}** The trial court found that there were deficiencies with the procedure under the statutory requirements of R.C. 2933.83. Specifically, R.C. 2933.83(B)(4) requires the following:

> (4) The administrator conducting the lineup shall make a written record that includes all of the following information:
>
> (a) All identification and nonidentification results obtained during the lineup, signed by the eyewitnesses, including the eyewitnesses' confidence statements made immediately at the time of the identification;
>
> (b) The names of all persons present at the lineup;
>
> (c) The date and time of the lineup;
>
> (d) Any eyewitness identification of one or more fillers in the lineup;
>
> (e) The names of the lineup members and other relevant identifying information, and the sources of all photographs or persons used in the lineup.

**{¶56}** The time at which the array was presented to Lee was not filled in on the blind administrator form and nothing was filled in on the form under the section "Names of persons present." The trial court found that these omissions were "deviations in the procedure." But the trial court correctly noted that these deviations could also be presented by the defense to the jury under R.C. 2933.83(C)(3), which provides:

> When evidence of a failure to comply with any of the provisions of this section, or with any procedure for conducting lineups that has been adopted by a law enforcement agency or criminal justice agency pursuant to division (B) of this section and that conforms to any provision of divisions (B)(1) to (5) of this section, is presented at trial, the jury shall be instructed that it may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification resulting from or related to the lineup.

**{¶57}** On this record, the trial court sufficiently explained its reasons for denying Bryson's motion to suppress. Moreover, Bryson did not request more detailed findings under Crim.R. 12(F).

**{¶58}** In light of the above, the trial court did not err in denying Bryson's motion to suppress and the first assignment of error is overruled.

B. Sufficiency of the Evidence

**{¶59}** An appellate court's function in reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy.

Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jenks* at 273.

{¶60} Bryson was convicted of aggravated murder under R.C. 2903.01(A), which provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *."

{¶61} Bryson contends that the evidence was insufficient to sustain the conviction, given the lack of physical evidence tying him to the crime, and the testimony of Lee, a convicted felon.

{¶62} Initially, we note that Bryson's insinuation about the credibility of Lee does not provide a basis for a challenge to the sufficiency of the evidence. The question is not whether the reviewing court should believe the evidence; but rather, whether the evidence, if believed, is adequate to "convince the average mind of the defendant's guilt beyond a reasonable doubt." *Jenks*, 61 Ohio St.3d at 273.

{¶63} There was a lack of physical evidence tying Bryson to the crime and, thus, the state's case rested on Lee's identification of Bryson and circumstantial evidence.

{¶64} As previously discussed, we find that neither the photo array nor its presentation to Lee were overly suggestive. Thus, Lee's identification of Bryson in and of itself was sufficient to support the conviction. *See State v. Jordan*, 10th Dist. No.

04AP-827, 2005-Ohio-3790, ¶ 14 ("even where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable juror could find the eyewitness testimony to be credible.").

**{¶65}** Additionally, the Ohio Supreme Court has held that circumstantial evidence alone is sufficient to support a conviction. *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988), paragraph one of the syllabus. Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. *Jenks,* paragraph one of the syllabus. "[A] conviction based upon purely circumstantial evidence may be just as reliable as a conviction based upon direct evidence, if not more so." *State v. Apanovitch*, 33 Ohio St.3d 19, 27, 514 N.E.2d 394 (1987).

**{¶66}** The state's theory of the case was that after Bryson saw Lyons in the bar that evening, Bryson left the bar, took off his gray shirt and returned to the bar, and then left again and waited until Lyons came out of the bar and shot him. No motive was offered for the shooting, but none was required. *State v. Lancaster*, 167 Ohio St. 391, 149 N.E.2d 157 (1958), paragraph two of the syllabus; *State v. Kemp*, 8th Dist. No. 97913, 2013-Ohio-167, ¶ 47. The state presented evidence, if believed, that would support that theory. Therefore, the evidence was sufficient to support the conviction and this court will not reverse it. *See Jenks*, *supra*, at paragraph two of the syllabus.

**{¶67}** Although this assignment of error is titled as one for a sufficiency of the evidence review (and the law is stated as such), the final sentence of the assignment states

that the "jury's verdict, therefore, exists as against the manifest weight of the evidence and, therewith, must be vacated by this Honorable Court."  Bryson also contends in his "statement of the case" that the "jury found facts as against the manifest weight of the evidence."  We disagree.

{¶68} The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other.  *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.  When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *Id.*  An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "exceptional   case in which the evidence weighs heavily against the conviction."  *Id.*

{¶69} Although a reviewing court weighs the evidence and considers the credibility of witnesses under a manifest weight of the challenge, it is well-settled that the weight of the evidence and resolution of issues of credibility are matters primarily for the fact-finder to assess.  *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶70} The Third Appellate District addressed witness credibility vis-a-vis a

manifest weight of the evidence review as follows:

> The word "primarily" could imply that in some instances the issue of credibility may become an issue for redetermination upon review. However, such instances would be quite rare. The demeanor of witnesses, the manner of their responses, and many other factors observable by a jury * * * simply are not available to an appellate court on review. While there may exist isolated rare cases in which the testimony of a witness is so garbled and internally contradictory, or so opposed to established scientific fact, as to warrant a reviewing court to exclude it from consideration in determining an issue of manifest weight, such an instance is not here presented. There is some contradiction, there is some impeachment, but there is no exceptional situation presented. Here the situation was fully capable of resolution by a jury which had heard the testimony given and observed the witness giving it. We conclude that no exception is here involved and the general rule must prevail. The credibility of the witnesses was here a matter solely and properly for determination by the jury. It by its verdict assigned full credibility to the testimony presented by the witnesses for the state. Having done so this court assigns such credibility and having done so, and having reviewed carefully the transcript of evidence, finds that the verdict was not against the weight of the evidence.

*State v. Bierbaum*, 3d Dist. No. 13-88-18, 1990 Ohio App. LEXIS 1204, *4 - *5 (Mar. 14, 1990).

{¶71} Similarly, here, Lee's testimony was not so incredible as to warrant its exclusion. Lee testified that he saw the shooter because he looked at him to see if he knew him in response to the shooter's question. He admitted that he had been drinking that evening, but denied that he was intoxicated; Officer Brown corroborated this assertion.

{¶72} Lee also testified that he was initially uncooperative with the police because he was more concerned about Lyons and wanted to go the hospital to see him. Further, the jury was aware of his prior convictions and it was in their province to evaluate his

credibility in light of those convictions.

{¶73} Additionally, the other evidence, albeit circumstantial, was not so incredible as to render this case exceptional and one in which the evidence weighs heavily against the conviction. That evidence included the surveillance video and the inferences that could be made therefrom. For example, an inference could be made that Bryson was not inside the bar at the time of the shooting. Another inference could be made that Bryson left the bar before shooting and took off his gray shirt.

{¶74} Further, although there was no altercation between Bryson and Lyons, and no direct testimony that the two were acquainted, an inference could be made, from the part of the video where Lyons went over to the table where Bryson was seated with three others and greeted everyone except Bryson, that in fact, they did know each other and did not like each other.

{¶75} Moreover, Wagner described the suspect he saw running from the scene as wearing a light-colored or white jacket and a white hat, which was the same description given by Lee; Bryson's "best-friend," Alora Ross, also testified that Bryson was attired that way and, in fact, Bryson admitted that he was wearing a white hat and white polo jacket that evening.

{¶76} Anonymous tips suggested that the shooter was "A. Hood" or "J. Hood"; Ross confirmed that Bryson's "street name" was "A. Hood."

{¶77} On this record, the conviction was not against the manifest weight of the evidence.

**{¶78}** Finally, Bryson states that he wanted to bring to this court's attention the "fact that the China House is, apparently, some type of 'ground zero' for Cleveland's gangland warfare, of which [Bryson] has no part." Further, Bryson contends that the state argued facts not in evidence during its closing argument. For example, the state argued to the jury that at a point in the surveillance video, close to the time of the shooting, when Bryson leaves the view of the camera, that he left through the front door.

**{¶79}** No evidence is in the record about the China House being "gangland" and, therefore, is not part of our consideration. Further, closing argument is not evidence, and the trial court instructed the jury as such.

**{¶80}** In light of the above, the trial court properly denied Bryson's Crim.R. 29 motion for acquittal and the verdict was not against the manifest weight of the evidence. The second assignment of error is therefore overruled.

**{¶81}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
MARY EILEEN KILBANE, J., CONCUR