[Cite as *State v. Rudd*, 2016-Ohio-106.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 102754**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# TERRENCE RUDD, JR.

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED IN PART; REVERSED IN PART;
AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-583175-A

**BEFORE:** Celebrezze, P.J., E.A. Gallagher, J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** January 14, 2016

**ATTORNEY FOR APPELLANT**

Britta M. Barthol
P.O. Box 218
Northfield, Ohio 44067


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:    Norman Schroth
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

FRANK D. CELEBREZZE, JR., P.J.:

{¶1} Defendant-appellant, Terrence Rudd Jr., brings this appeal challenging his convictions for murder and felonious assault, and the trial court's imposition of court costs. Specifically, appellant argues that: (1) the evidence was insufficient to support his convictions, (2) his convictions are against the manifest weight of the evidence, and (3) the trial court erred by failing to advise him of court costs at the time of sentencing. After a thorough review of the record and law, this court affirms in part, reverses in part, and remands for further proceedings.

## I. Factual and Procedural History

{¶2} On October 29, 2013, Demarte Allen was shot and killed following an argument and physical encounter near East 71st Street and Chambers Avenue in Cleveland's Slavic Village.

{¶3} The Cuyahoga County Grand Jury returned a multiple count indictment charging Terrence Rudd, Jr. ("appellant") with: (1) aggravated murder, R.C. 2903.01(A), (2) murder, R.C. 2903.02(B), (3) felonious assault, R.C. 2903.11(A)(2), and (4) felonious assault, R.C. 2903.11(A)(1). All four counts contained both one- and three-year firearm specifications. Appellant pled not guilty to the indictment.

{¶4} The parties were unable to reach a plea agreement, and appellant elected to proceed to trial. A jury trial commenced on January 6, 2015.

### A. Trial Testimony

**{¶5}** The jury heard eyewitness testimony from the following individuals: (1) Mark Allen, (2) Demarko Allen, (3) Antoine Rox ("Rox"), (4) Stanley Peacock ("Peacock"), (5) Melissa Adams, and (6) Launer Norman.

**{¶6}** First, Mark Allen testified that he and his brothers walked to the Sunoco gas station on Fleet Avenue, between East 70th and East 71st Street, on the night of October 29, 2013. Mark testified that his brother Demarko bumped into either appellant or Peacock, fighting words were exchanged between the groups, and he and his brothers followed appellant and Peacock. Mark testified that appellant ran away from him and his brothers. Mark testified that his brother Demarte walked ahead of him and Demarko to confront Peacock. Mark testified that a man standing on a nearby porch warned him that there was a police car at the corner of Fleet Avenue and East 71st Street.

**{¶7}** Mark testified that he heard one gunshot, saw his brother Demarte lying on the ground, and saw a "short dude with the glasses" standing over his brother. Furthermore, Mark testified that he moved closer to the "person with the glasses" and observed a black gun in his hand, pointed toward the ground. Mark testified that the shooter was carrying a black gun, "probably say a 9 mm or a .40." Mark testified that Peacock told appellant to "get up out of there, to run." Mark testified that the person wearing glasses ran through the field toward Chambers Avenue. Mark testified that he ran to Demarte, found him unresponsive, and began fighting Peacock out of rage.

**{¶8}** Mark identified appellant from a photo array as the person with a gun on the night of the shooting, but told police he "wasn't for sure." Mark identified appellant in

court as the person wearing glasses and holding a weapon that night. Mark testified that when police asked if he could identify the person who shot his brother, he told the police "I don't remember what he looked like, all I know he had glasses." Mark explained that he told the police that he could not remember every detail about the shooter, but that "he was a short dude with glasses, nappy hair."

{¶9} Second, Demarko Allen testified that he went to the Sunoco gas station on Fleet Avenue, between East 70th and East 71st Street, with his brothers Demarte and Mark on the evening of October 29, 2013. Demarko testified that he and his brothers left the gas station and crossed paths with appellant and his friend, Peacock. Demarko testified that he bumped into appellant and told him to watch where he was going. Demarko testified that he and appellant exchanged "fighting words." Demarko testified that he and his brothers followed appellant and Peacock through the Cleveland Public Library's parking lot and through the parking lot of a flower shop at East 71st Street and Broadway Avenue. Demarko testified that he caught up with appellant at East 71st Street and attempted to punch him. Demarko testified that appellant ducked and ran toward Chambers Avenue with Peacock. Demarko testified that a man standing on his porch on East 71st Street told him and his brothers "guys around here, they don't fight, they shoot." Demarko testified that he and his brothers did not pursue appellant and Peacock, and continued walking. Demarko testified that appellant and Peacock returned, and that his brother Demarte ran toward them and put his fists up. Demarko testified that Demarte and Peacock were squaring up to fight when appellant raised a black pistol and fired a

single shot at Demarte.

{¶10} Demarko testified that Demarte fell to the sidewalk and appellant "took off" down Chambers Avenue. Demarko testified that Peacock did not flee the scene. Demarko testified that he ran toward his brother Demarte to check on his condition and Mark ran towards Peacock to fight him. Demarko testified that he joined the fight between Mark and Peacock after he realized Demarte was no longer breathing.

{¶11} Demarko identified appellant from a photo array as the person who shot his brother. Demarko identified the appellant in the courtroom as both the person he identified in the photo array and the person who shot his brother on October 29, 2013. Demarko testified that appellant was wearing prescription glasses on the night of the shooting, and that he neither saw Peacock wearing glasses nor holding a weapon on the night of the shooting.

{¶12} Third, the state presented the eyewitness testimony of Antoine Rox. Although Rox did not identify the appellant as the shooter, he provided officers with a detailed description of the shooter.

{¶13} Rox testified that he was outside, in front of his house, on the evening of October 29, 2013. Rox testified that he observed three young males, one wearing red jogging pants, walking toward his house on the sidewalk. Rox testified that another group of three males ran through the field next to his house and exchanged words with the group of males on the sidewalk. Rox testified that the male wearing red jogging pants threw off his jacket and approached the group of males in the field "like he was ready to

fight."

{¶14} Rox testified that "[t]he individual in the black jacket and blue jeans pulled out a handgun and shot [the male in the red pants]." Rox testified that as the male pulled out the gun, he said "you think this is a game?" Rox testified that he was standing on his porch and saw the shooter from a "side view." Rox testified that the shooter was approximately 5' 5" or 5' 6" and "between sixteen and eighteen. Fairly young." Furthermore, Rox testified that the male "shot one time and retreated."

{¶15} Rox testified that the male who shot the victim wore glasses. Rox testified that the male with the handgun was the only person wearing glasses, and that he did not see anybody else with a weapon. Rox testified that the male's gun was a handgun, and that it "looks like a black automatic to me * * * maybe like .380 or 9 mm." Rox testified that after firing the shot, the male "paused for a second. Then he turn around and ran."

{¶16} Rox testified that after the shooter ran, there were two groups of males in the field: (1) the two males who were with the shooter, and (2) the three males who had been on the sidewalk, including one who was wearing red pants. Rox testified that of the three males from the sidewalk, one of the males had been shot and was on the ground, another male was holding the male who had just been shot and said "you shot my brother," and the third male was "tussling" with the two males who were with the shooter. On re-direct examination, Rox testified that the male said "he shot my brother," rather than "you shot my brother." Rox testified that the shooter was gone when the male told the police "he shot my brother." Rox testified that the police arrived on the scene less than a minute

after the shot was fired. Rox testified that the police subdued everybody in the field, and that the person with the glasses who shot the gun was not subdued because he was gone. Rox testified that the two males who were with the shooter had not left the field, and were subdued by the police. Rox testified that the three males, including the male with the red pants, had not left the field, and were subdued by the police. Rox testified that he gave an oral statement to Detective Sowa on the night of the shooting, and that he made a written statement to the police in June of 2014.

{¶17} Fourth, appellant's friend Stanley Peacock testified as a court's witness. Peacock testified that he ran into appellant at East 69th Street and Fleet Avenue on his way to the Sunoco gas station on October 29, 2013. Peacock testified that he and appellant bumped into the Allen brothers — who were strangers — on the sidewalk outside of the Sunoco. Peacock testified that one of the brothers exchanged fighting words with appellant. Peacock testified that he and appellant continued walking back towards Broadway Avenue, crossing East 71st Street, on the way to his sister's house. Peacock testified that the Allen brothers followed him and appellant. Peacock testified that he was willing to fight the brothers to protect appellant, who he considered to be a good friend. Peacock testified that appellant began running down Chambers Avenue toward East 69th Street. Peacock testified that he did not run with appellant, and turned to fight the Allen brothers. Peacock testified that he began fighting Demarte Allen and heard a gunshot coming from down Chambers Avenue. Peacock testified that neither he nor the Allen brothers had guns. Peacock testified that Demarte fell to the sidewalk, one of the other

Allen brothers yelled "you all killed my brother," and both Demarko and Mark Allen began to fight him.

{¶18} Peacock testified that neither he nor any of the Allen brothers were wearing glasses on October 29, 2013. Furthermore, Peacock testified that appellant was wearing "[r]egular glasses, like clear glasses" on the night of the shooting.

{¶19} On the night of the shooting, Peacock told police that "T-Man" was the shooter, and identified a picture of appellant as "T-Man." However, Peacock testified that his statement to the police on the night of the shooting was not truthful, and that he lied to the police out of fear of going to jail. Peacock testified that neither he nor any of the Allen brothers were wearing glasses on October 29, 2013. Furthermore, Peacock testified that appellant was wearing "[r]egular glasses, like clear glasses" on the night of the shooting.

{¶20} Fifth, Peacock's sister Melissa Adams testified as a court's witness. Adams testified that she was standing outside sometime around dusk when she saw appellant run past her. Adams testified that Peacock was walking down Chambers Avenue and some people were following him. Adams testified that she asked Peacock what was going on, and he told her he thought he was going to be jumped. In her statement to the police, Adams told detectives that appellant had a gun, pointed the gun at Demarte Allen, and fired. Adams testified that her statement to the police on the night of the shooting was false.

{¶21} Sixth, Melissa Adams's friend, Launer Norman testified as a court's

witness. Norman testified that she was waiting to be picked up outside of Adams's house on East 69th Street and Chambers Avenue on the evening of October 29, 2013. Norman testified that she saw appellant run by her, then heard a gunshot and Peacock's voice as he was running toward her on Chambers Avenue.

{¶22} In her statement to police on the night of the shooting, Norman claimed that she saw appellant holding a black handgun when he ran past her outside of Adams's house. However, Norman recanted this portion of her statement during her trial testimony.

## B. State's Other Evidence

{¶23} Mark and Demarko Allen both identified appellant as the shooter on the night of the incident.

{¶24} Detective Katherine Cruz testified that officers conducted photo arrays during the interviews of the Allen brothers on the night of the incident. Detective Cruz testified that Officer Marvin Young administered Mark Allen's photo array and Detective James Raynard administered Demarko Allen's photo array.

{¶25} Officer Young testified that after showing Mark Allen the photo array, Mark identified appellant as the individual who committed the crime.

{¶26} Detective Raynard testified that after showing Demarko Allen the photo array, Demarko identified appellant and said "he shot my brother."

## C. Verdict and Sentence

{¶27} The trial court overruled the defense's Crim.R. 29 motions for acquittal —

both at the close of the state's case and at the close of all the evidence. The jury found appellant guilty of Counts 2, 3, and 4, and not guilty of Count 1.

{¶28} The trial court merged all counts for the purposes of sentencing and the state elected to proceed with sentencing on Count 2. The trial court sentenced appellant to a prison term of 15 years to life on Count 2, and an additional three years for the firearm specification. The trial court ordered appellant's sentence to be served at the Lorain Correctional Institution. The trial court credited appellant with 460 days of time served.

{¶29} Appellant filed the instant appeal assigning three errors for review:

I. The evidence was insufficient as a matter of law to support a finding beyond a reasonable doubt that the appellant was guilty of murder and felonious assault.

II. Appellant's convictions for murder and felonious assault were against the manifest weight of the evidence.

III. The trial court erred and deprived appellant of his property without due process of law and his rights under the Fifth Amendment of the United States Constitution when it imposed court costs outside his presence.

## II. Law and Analysis

### A. Sufficiency

{¶30} Appellant first argues his murder and felonious assault convictions are not supported by sufficient evidence and, therefore, the trial court erred in denying his Crim.R. 29 motions for acquittal.

{¶31} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. Crim.R. 29 requires the trial court to issue a judgment of acquittal where the evidence presented by the state is

insufficient to sustain a conviction for an offense. *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, ¶ 21. This court reviews the denial of such a motion using the same standard employed in a sufficiency claim. *Id.* at ¶ 21-23, citing *Cleveland v. Pate*, 8th Dist. Cuyahoga No. 99321, 2013-Ohio-5571, citing *State v. Mitchell*, 8th Dist. Cuyahoga No. 95095, 2011-Ohio-1241.

**{¶32}** The state has the burden of proving each element of a charged offense. A claim that a conviction is unsupported by sufficient evidence tests whether the state has met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). This court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In a sufficiency inquiry, an appellate court does not assess whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25.

**{¶33}** Appellant was convicted of murder in violation of R.C. 2903.02(B) and felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2).

**{¶34}** R.C. 2903.02(B), murder, provides:

No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

**{¶35}** R.C. 2903.11(A), felonious assault, provides:

No person shall knowingly do either of the following:

(1)  Cause serious physical harm to another or to another's unborn;

(2)  Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

**{¶36}** Appellant first argues that the state's evidence showing that he was the shooter was weak, conflicting, and unreliable.   We disagree.

**{¶37}** In *State v. Bryson*, this court held that eyewitness identification testimony alone is sufficient to support a conviction — even where discrepancies exist — so long as a reasonable juror could find the eyewitness testimony to be credible.   *State v. Bryson*, 8th Dist. Cuyahoga No. 98298, 2013-Ohio-934*, _* 64; *see State v. Jordan*, 10th Dist. Franklin No. 04AP-827, 2005-Ohio-3790, ¶ 14.

**{¶38}** Initially, we note that appellant's insinuation about the credibility of the eyewitnesses does not provide a basis for a challenge to the sufficiency of the evidence. *See Bryson* at _ 62.   The question is not whether the reviewing court should believe the evidence, but whether the evidence, if believed, is adequate to "convince the average mind of the defendant's guilt beyond a reasonable doubt."   *Jenks*, 61 Ohio St.3d at 259, 273, 574 N.E.2d 492.

**{¶39}** There was a lack of physical evidence tying appellant to the crime and, thus, the state's case rested on: (1) the Allen brothers' identification of appellant as the shooter, (2) eyewitness testimony, and (3) circumstantial evidence.

### 1. Identification of Appellant

**{¶40}** Mark and Demarko Allen both identified appellant as the shooter.

**{¶41}** In *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, this court explained a blind administration of a photo array:

> R.C. 2933.83 governs eyewitness identification procedures in lineups. Subsection (B)(1) of the statute provides in part that "[u]nless impracticable, a blind or blinded administrator shall conduct the live lineup or photo lineup." A blind administrator "means the administrator does not know the identity of the suspect."
> R.C. 2933.83(A)(2). "If a blind administrator is conducting the live lineup or the photo lineup, the administrator shall inform the eyewitness that the suspect may or may not be in the lineup and that the administrator does not know who the suspect is." R.C. 2933.83(B)(5).

*Id*. at ¶ 42.

**{¶42}** Detective Katherine Cruz testified that she interviewed Demarko Allen and Detective Sowa interviewed Mark Allen on the night of the shooting. Detective Cruz testified that officers conducted photo arrays during the interviews of the Allen brothers. Detective Cruz testified that Officer Marvin Young administered Mark Allen's photo array and Detective James Raynard administered Demarko Allen's photo array. Detective Cruz explained the procedure for photo arrays:

> in order to protect the integrity of the photo arrays, it's usually given to a law enforcement person, whether it's a detective or uniformed police officer. Anyone that can assist us who is not familiar with the suspect, the suspect's

name, the suspect's identity that could in no way influence the photo lineup process.

**{¶43}** Officer Young testified that he did not know the identity of the shooter at the time he administered the photo array. Officer Young testified that he was alone in the room with Mark Allen when he administered the photo array. Officer Young testified that he read the blind administrator verbal instructions to Mark Allen before showing him the photo array. The instructions were as follows:

> I am going to show you a group of photographs. These photographs may or may not contain a picture of the person who committed the crime now being investigated. I do not know the suspect — I don't know who the suspect is. Keep in mind that any hairstyles, beards and mustaches can easily be changed. Also photographs may not always depict the true complexion of a person. It may be even lighter, darker than shown in a photo. Pay no attention to any markings or number that may appear on the photo or any differences in the type or style shown on the photographs.
>
> When you look at all the photos, tell me whether or not you see any person you recognize. Do not tell other witnesses that you have or have not identified anyone.

**{¶44}** Officer Young testified that he read these instructions to Mark Allen verbatim. Officer Young testified that after showing Mark Allen the photo array, Mark identified appellant as the individual who committed the crime. Officer Young testified that it took "about three minutes" to administer Mark Allen's photo array.

**{¶45}** Detective Raynard testified that a "blind administrator" means that the office administering the photo array has no knowledge as to the persons involved. Detective Raynard testified that he did not have any information regarding the suspect when he administered the photo array. Detective Raynard testified that he was alone in the room

with Demarko Allen when he administered the photo array. Detective Raynard testified that he read the blind administrator verbal instructions verbatim to Demarko Allen before administering the photo array.

**{¶46}** Detective Raynard testified that after showing Demarko Allen the photo array, Demarko identified appellant and said, "he shot my brother." When asked how long it took Demarko Allen to make an identification from the photo array, Detective Raynard testified, "it wasn't very long."

**{¶47}** After reviewing the record, we find that the officer's presentations of the photo arrays to the Allen brothers were neither overly suggestive nor biased. Thus, the Allen brothers' identification of appellant as the shooter — in and of itself — was sufficient to support the convictions.

### 2. Eyewitness Testimony

**{¶48}** The eyewitness testimony supported the Allen brothers' identification of appellant as the shooter.

**{¶49}** First, Mark Allen testified that he identified appellant from the photo array as the person with a gun on the night of the shooting, but told police he "wasn't for sure." Mark identified appellant in court as the person wearing glasses and holding a weapon on the night of the shooting. Mark testified that he heard a gunshot, looked around, saw his brother laying on the ground, and saw a "short dude with the glasses" standing over his brother. Furthermore, Mark testified that he moved closer to the "person with the glasses" and observed a gun in his hand. Mark testified that the shooter was carrying a

black gun, "probably say a 9 mm or a .40." Mark testified that after the shooting, the person wearing glasses ran through the field toward Chambers Avenue. When asked if he could identify the person who shot his brother, Mark testified that he told the police "I don't remember what he looked like, all I know he had glasses." Mark explained that he told the police that he could not remember every detail about the shooter, but that "he was a short dude with glasses, nappy hair."

{¶50} Second, Demarko Allen testified that he identified appellant from the photo array as the person who shot his brother. Demarko testified that his brother Demarte and Peacock were squaring up to fight when appellant raised a black pistol and shot his brother. Demarko testified that appellant fired one shot and then "took off" down Chambers Avenue. Demarko identified the appellant in the courtroom as both the person he identified in the photo array and the person who shot his brother on October 29, 2013. Demarko testified that appellant was wearing prescription glasses on the night of the shooting, and that he neither saw Peacock wearing glasses nor holding a weapon on the night of the shooting.

{¶51} Third, in addition to the Allen brothers' identifications of appellant, the state presented the eyewitness testimony of Rox. Although Rox did not identify the appellant as the shooter, he provided officers with a detailed description of the shooter.

{¶52} Rox testified that an "individual in the black jacket and blue jeans pulled out a handgun and shot [the victim]." Furthermore, Rox testified that the male "shot one time and retreated." Rox testified that he was standing on his porch and saw the shooter from

a "side view." Rox testified that the shooter was approximately 5' 5" or 5' 6" and "between 16 and 18. Fairly young."

{¶53} Rox testified that the male who shot the victim was wearing black-framed glasses. Rox testified that the male with the handgun was the only person wearing glasses, and that he did not see anybody else with a weapon. Rox testified that the male's gun was a handgun, and that it "looks like a black automatic to me * * * maybe like .380 or 9 mm." Rox testified that after firing the shot, the male "paused for a second. Then he turn around and ran."

{¶54} Rox testified that the police arrived on the scene less than a minute after the shot was fired. Rox testified that the police subdued everybody in the field, and that the person with the glasses who shot the gun was not subdued because he was gone. Rox testified that the two males who were with the shooter had not left the field, and were subdued by the police. Rox testified that the three males, including the male with the red pants, had not left the field, and were subdued by the police.

{¶55} Fourth, Peacock testified that neither he nor any of the Allen brothers were wearing glasses on October 29, 2013. Furthermore, Peacock testified that appellant was wearing "[r]egular glasses, like clear glasses" on the night of the shooting.

{¶56} Taken together, the Allen brothers' identification of appellant as the shooter and the testimony of the Allen brothers, Rox, and Peacock, if believed, was sufficient to establish all the essential elements of the offenses with which appellant was charged. Accordingly, viewing the evidence in a light most favorable to the state, a rational jury

could have determined beyond a reasonable doubt that appellant was guilty of murder and felonious assault.

### 3. Circumstantial Evidence

**{¶57}** The Ohio Supreme Court "has 'long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990). The question is whether the state presented sufficient evidence that, if believed, would support the jury's convictions of murder and felonious assault beyond a reasonable doubt.

**{¶58}** The state's theory of the case was that: (1) a verbal argument took place between the Allen brothers and appellant and Peacock; (2) the argument escalated, and the Allen brothers followed appellant and Peacock to an empty lot on East 71st Street and Chambers Avenue; (3) appellant left the lot and returned with a gun; (4) appellant fired a single shot, killing Demarte Allen; and (5) appellant fled down Chambers Avenue toward East 69th Street. The state presented evidence, if believed, that would support that theory. Therefore, the evidence was sufficient to support the conviction.

**{¶59}** The state presented the testimony of Officer Robert Alford, a first responder to the scene of the murder. Officer Alford testified that officers detained and searched Demarko Allen, Mark Allen, Peacock, Melissa Adams, and Launer Norman on the night of the shooting. Officer Alford testified that police did not find any weapons during the

searches. Thus, an inference could be made that after shooting Demarte Allen, appellant fled the scene with the murder weapon and evaded the officers responding to the scene.

**{¶60}** Viewing the evidence in a light most favorable to the state, a rational jury could have determined beyond a reasonable doubt that appellant was guilty of murder and felonious assault. In light of the above, appellant's first assignment of error is overruled.

### B. Manifest Weight

**{¶61}** In contrast to a challenge based on sufficiency of the evidence, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion rather than production. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541; *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When considering a claim that a conviction is against the manifest weight of the evidence, this court sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of conflicting testimony." *Thompkins* at 387. The weight-of-the-evidence standard "addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387.

**{¶62}** This court reviews the entire record, weighs the evidence and all reasonable inferences, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st

Dist.1983). In conducting such a review, this court remains mindful that the credibility of the witnesses is primarily for the trier of fact to assess. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to make credibility determinations because this court cannot view the demeanor of a witness while testifying. Therefore, the trier of fact is in the best position to determine if the proffered testimony is credible. *State v. Holloway*, 8th Dist. Cuyahoga No. 101289, 2015-Ohio-1015, ¶ 42, citing *State v. Kurtz*, 8th Dist. Cuyahoga No. 99103, 2013-Ohio-2999, ¶ 26. Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

**{¶63}** Appellant argues that his convictions are against the manifest weight of the evidence because: (1) there was no physical evidence linking him to the crime at trial, and (2) the testimony of the witnesses lacked credibility. Furthermore, appellant argues that based on the evidence, it is more likely that Peacock was the shooter.

### 1. Inconsistent Testimony

**{¶64}** In support of his manifest weight challenge, appellant highlights several discrepancies between the testimony of the eyewitnesses and inconsistencies between the eyewitness' trial testimony and statements made to the police following the incident. Appellant argues that there are "significant inconsistencies" in the eyewitness' testimony and that the eyewitness' testimony is neither credible nor reliable.

{¶65} Appellant identifies the following inconsistencies between Demarko Allen's trial testimony and the statement he gave to police on the night of the shooting: (1) he told police that appellant and Peacock were following his brothers and him, but he testified that he and his brothers followed appellant and Peacock; and (2) in his written statement, he indicated that appellant said "wait right here," but he testified that appellant took off running without saying anything.

{¶66} Appellant argues that Mark Allen's criminal history casts doubt on the veracity of his testimony. Furthermore, appellant identifies the following inconsistencies between Mark and Demarko's testimony: (1) Mark testified that Peacock bumped into Demarko, but Demarko testified that appellant bumped into him; (2) Mark testified that appellant remained silent, but Demarko testified that appellant told him to "wait right here"; (3) Mark testified that he did not see the shooting, but told the police that he saw the shooter pull out a gun; (4) Mark told police that he saw the shooter pull out a gun, but Demarko testified that appellant was holding a gun when he approached Demarte; and (5) Mark testified that his statement to police that he saw the shooter pull out a gun was a lie.

{¶67} Appellant identifies the following inconsistencies between the testimony of the Allen brothers and Rox: (1) Demarko testified that Rox told him "guys around here, they don't fight, they shoot," but Rox testified that he did not say this to the Allen brothers; (2) Rox testified that the Allen brothers told him "niggas trying to start some shit" and he told them "just go ahead and live your lives, don't worry about it"; (3) Mark testified that Rox told the Allen brothers to "leave that alone"; (4) Mark testified that Rox told him that

the police were at the corner of East 71st Street and Fleet Avenue, but Rox testified that he did not tell anyone that the police were down the street; and (5) Rox testified that the shooter pulled out a gun from his waistband, but Demarko testified that appellant was holding a gun when he approached Demarte.

**{¶68}** Appellant argues that Peacock is not a credible witness, insinuating that his testimony was self-serving and that "he simply was accusing someone else of a crime that he may have committed." Appellant identifies the following inconsistencies with Peacock's testimony: (1) Peacock testified that his statement to police on the night of the incident was not truthful; (2) Peacock identified appellant as the shooter in his statement to the police, but Officer Alford testified that both Demarko Allen and the crowd at the scene of the shooting referred to Peacock as the shooter; and (3) Peacock identified appellant as the shooter, but Peacock had gunshot residue on both of his hands on the night of the shooting.

**{¶69}** In challenging Peacock's credibility, appellant highlights Officer Alford's testimony. Officer Alford testified that he arrived at the scene and Demarko Allen approached his car saying something to the effect of "[m]y brother got shot." Furthermore, Officer Alford testified that Demarko was yelling to another individual in the area "something to the effect of, 'he shot my brother. He shot my brother.'" Officer Alford testified that Demarko Allen was referring to Peacock as the person who shot his brother. Officer Alford testified that he overheard people in the crowd saying "he shot him," "he has a gun," and "he killed that guy." Officer Alford testified that the only two

people in the field when he overheard these statements from the crowd were Demarko Allen and Peacock.

**{¶70}** Appellant argues that Melissa Adams is not a credible witness because Peacock — who was involved in the incident — is her brother. Appellant identifies the following inconsistencies with Ms. Adams's testimony: (1) she told police that she did not see the shooting, but later gave a statement identifying appellant as the shooter; (2) she testified that Detective Cruz wanted her to identify T-man as the shooter; and (3) she testified that the statement she gave to police on the night of the incident was a lie.

**{¶71}** Appellant argues that Launer Norman is not a credible witness because she is friends with Melissa Adams and "has known Peacock since he was a young boy." Appellant identifies the following inconsistencies with Ms. Norman's testimony: (1) she told officers at the scene that she did not see the shooting, but later gave a statement to the police stating that she saw appellant run past her with a gun; and (2) she testified that she lied to the police, and told them what they wanted to hear, so she could go home to her daughter.

**{¶72}** As detailed above, there are a number of inconsistencies among the witnesses' testimony in this case. However, a conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent or contradictory testimony. *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38, citing *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11; *see also State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37 ("'While the jury may

take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, *7 (May 28, 1996). The decision whether, and to what extent, to believe the testimony of a particular witness is "within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 54.

{¶73} "'Even where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable juror could find the eyewitness testimony to be credible.'" *State v. Robinson*, 8th Dist. Cuyahoga No. 100126, 2014-Ohio-1624, ¶ 12, quoting *Johnson* at ¶ 52; *State v. Jordan*, 10th Dist. Franklin No. 04AP-827, 2005-Ohio-3790, ¶ 14. "'The reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury.'" *State v. Roper*, 9th Dist. Summit No. 20836, 2002-Ohio-7321, ¶ 55, quoting *Foster v. California*, 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

{¶74} This case came down to the credibility of the eyewitnesses. As detailed above, the jury was presented with reasons — such as inconsistent statements, prior convictions, or alleged bias — to question the credibility of Demarko Allen, Mark Allen, Rox, Peacock, Melissa Adams, and Launer Norman. However, it was within the jury's province to evaluate the witnesses' credibility in light of these issues. Furthermore, the jury was also given reasons to believe the eyewitness' testimony.

{¶75} First, the Allen brothers consistently described the shooter as a male wearing dark clothing and black glasses. These descriptions are corroborated by Rox's testimony. Second, the Allen brothers identified appellant as the shooter from photo arrays. Detective Cruz, Detective Raynard, and Officer Young testified that the photo arrays were administered "blindly" to prevent the photo array from being unduly suggestive or biased. Third, all of the witnesses who heard the gunshot testified that only a single shot was fired. This testimony was corroborated by both the single-spent shell casing recovered at the scene and the single bullet recovered from Demarte's body. Fourth, the eyewitnesses to the shooting testified that the shooter was wearing eyeglasses at the time the shooting took place. Fifth, all of the witnesses testified that no weapons were recovered from anyone at the scene where the shooting took place.

{¶76} Based on this evidence, the jury reasonably could have concluded that: (1) the Allen brothers' identification of appellant as the shooter was credible and reliable, (2) the police did not recover a weapon at the scene of the shooting because appellant fled the scene with the murder weapon and evaded the responding police officers, and (3) the "(he/you) shot (my brother/him)" statements made by Demarko Allen and the people in the crowd referred to appellant, who was no longer present at the scene, rather than Peacock.

### 2. Physical Evidence

{¶77} Appellant argues that his convictions were against the manifest weight of the evidence because there was no physical evidence linking him to the crime.

{¶78} Lisa Przepyszny, a forensic scientist in the trace evidence department of the

Cuyahoga County Medical Examiner's Office, testified that she collected samples from Demarte Allen, Mark Allen, Demarko Allen, and Peacock to test for gunshot residue.

{¶79} Przepyszny testified that she observed one particle containing lead and antimony, indicative of gunshot residue, on Peacock's right hand. Przepyszny testified that she observed the following on Peacock's left hand:

> I found one particle of lead, barium and antimony, so one particle characteristic of gunshot residue. And I found four particles indicative of gunshot residue. Three of those particles contained lead and antimony. And one of those particles contained lead and barium.

{¶80} Przepyszny testified that samples collected from the hands of Demarte Allen, Demarko Allen, and Mark Allen were also indicative of gunshot residue.

{¶81} Przepyszny testified that there are "three essential ways" that gunshot residue can get on a person's hands: (1) firing a weapon, (2) being in close proximity to a fired weapon, or (3) handling an object that has gunshot residue on it. Furthermore, Przepyszny testified that she cannot determine from gunshot residue tests whether an individual fired a weapon or was just in close proximity to a weapon that was fired. Based on this evidence, the jury reasonably could have concluded that gunshot residue was on Peacock's hands because he was in close proximity to the shooter when he fired the gun.

{¶82} After reviewing the entire record, weighing the strength and credibility of the evidence presented and the inferences to be reasonably drawn therefrom, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that appellant's convictions were against the manifest weight of the evidence.

**{¶83}** Accordingly, appellant's second assignment of error is overruled.

## C. Court Costs

**{¶84}** Appellant argues that the trial court erred by failing to advise him of court costs at sentencing. The state concedes this error on appeal.

**{¶85}** R.C. 2947.23(A)(1)(a), judgment for costs and jury fees, provides "[i]n all criminal cases, including violations of ordinances, the judge or magistrate shall include in the sentence the costs of prosecution, including any costs under section 2947.231 of the Revised Code, and render a judgment against the defendant for such costs."

**{¶86}** In *State v. Joseph*, the Ohio Supreme Court addressed the issue of whether a trial court may impose court costs under R.C. 2947.23 in its sentencing entry when the trial court did not impose those costs during the sentencing hearing. *State v. Joseph*, 125 Ohio St.3d 76, 2010-Ohio-954, 926 N.E.2d 278. The court held that it is reversible error under Crim.R. 43(A) for the trial court to impose court costs in its sentencing entry when it did not impose those costs in open court at the sentencing hearing. *Id.* at ¶ 22. The court reasoned that the defendant was harmed by the trial court's error, as he "was denied the opportunity to claim indigency and to seek a waiver of the payment of court costs before the trial court." *Id.* Furthermore, the court found that the remedy in such a situation is a limited remand to the trial court, allowing the defendant to seek a waiver of court costs. *Id.* at ¶ 23.

**{¶87}** In the instant matter, the trial court did not impose court costs at sentencing. However, the trial court imposed court costs in its journal entry "in an amount equal to the

costs of this prosecution." Accordingly, we reverse the portion of the trial court's judgment imposing court costs and remand the matter for the limited purpose to allow appellant the opportunity to move the trial court for a waiver of payment of court costs. *See State v. Thompson*, 8th Dist. Cuyahoga No. 99467, 2013-Ohio-4793, ¶ 26.

{¶88} Appellant's third assignment of error is sustained.

### III. Conclusion

{¶89} Based on the foregoing analysis, the trial court properly denied appellant's Crim.R. 29 motions for acquittal. When viewed in the light most favorable to the prosecution, the state's evidence, if believed, was sufficient for the jury to conclude that appellant committed murder and felonious assault.

{¶90} The jury's verdict was not against the manifest weight of the evidence. While there were inconsistencies in the testimony of the witnesses during trial, the jury was in the best position to judge the credibility of the witnesses accordingly. Furthermore, after reviewing the record, we cannot conclude that the inconsistencies in the witnesses' testimony rendered their testimony so unreliable or unworthy of belief that the jury lost its way and engaged in a manifest miscarriage of justice in finding appellant guilty of the offenses.

{¶91} Appellant's third assignment of error is sustained. The trial court erred in imposing court costs in its sentencing entry when it did not impose those costs during the sentencing hearing.

{¶92} Accordingly, the appellate court's judgment is affirmed in part, reversed in part, and remanded for the limited purpose of allowing appellant to seek a waiver of court

costs.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK D. CELEBREZZE, JR., PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
EILEEN T. GALLAGHER, J., CONCUR